**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| L2 MOBILE TECHNOLOGIES LLC,<br><br>       Plaintiff,<br><br>   v.<br><br>GOOGLE LLC,<br><br>       Defendant. | Case Nos. 6:21-cv-00358-ADA<br><br><br>JURY TRIAL DEMANDED |

**DEFENDANT GOOGLE LLC'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     TECHNICAL BACKGROUND.........................................................................1

    A.      U.S. Patent No. RE47,200 .....................................................................1

    B.      U.S. Patent No. 8,054,777 and U.S. Patent No. 8,179,913...................3

III.    APPLICABLE LEGAL PRINCIPLES.............................................................5

IV.     CLAIM TERMS ..................................................................................................6

    A.      Order Of Method Steps ['200 patent, Claim 10] ....................................6

    B.      "consisting of corresponding security count values of the established channels in the wireless communications device that utilize the second key" ['200 patent, Claims 10, 14] ...................................................................10

    C.      "the first value is at least as great as the x most significant bits (MSBx) of a value in the first set and at least one of the established channels utilizing the first security key" ['200 patent, Claim 10] .........................................12

    D.      "a first predetermined value" ['200 patent, Claims 10, 11]...................14

    E.      "only reestablishing the receiving side in the RLC entity of the communications device" ['777 patent, Claims 1 and 2].........................16

    F.      "reestablishing the receiving side" ['777 patent, Claims 1 and 2].........19

    G.      "Move Receiving Window (MRW) Acknowledgement (ACK) Status PDU" ['777 patent, Claims 1 and 2].................................................................21

    H.      "accurately reestablishing the receiving side" ['777 patent, Claim 2]...................22

    I.      "control circuit" ['777 patent, Claim 2; '913 patent, Claim 3]..............25

    J.      "reset procedure" ['913 patent, Claims 1 and 3]...................................28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Abbott Diabetes Care Inc.*,
    696 F.3d 1142 (Fed. Cir. 2012).................................................................................. 18

*Acceleration Bay LLC v. Activision Blizzard, Inc., CV,*
    16-453-RGA, 2018 WL 456035 (D. Del. Jan. 17, 2018)......................................... 13

*Amgen Inc. v. Sandoz Inc.*,
    923 F.3d 1023 (Fed. Cir. 2019)................................................................................... 6

*ART+COM Innovationpool GmbH v. Google Inc.*,
    No. 14-271-RGA, 2015 U.S. Dist. LEXIS 83132 (D. Del. June 26, 2015).............. 9

*Bell Commc'ns, Inc. v. Vitalink Commc'ns Corp.*,
    55 F.3d 615 (Fed. Cir. 1995)..................................................................................... 25

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018).................................................................................. 23

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
    967 F.3d 1353 (Fed. Cir. 2020).................................................................................. 24

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004).................................................................................... 23

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002).................................................................................... 24

*Ch. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
    677 F.3d 1361 (Fed. Cir. 2012).................................................................................. 18

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004)............................................................................ 13, 14

*Dyfan, LLC v. Target Corp.*,
    No. W-19-CV-00179-ADA, 2020 WL 8617821 (W.D. Tex. Nov. 24, 2020).................... 5, 27

*eCeipt, LLC v. Victoria's Secret Stores, LLC*,
    No. 6:20-CV-747-ADA, 2021 WL 4037599 (W.D. Tex. Sept. 3, 2021) .................... 5

*Egenera, Inc. v. Cisco Sys., Inc.*,
    972 F.3d 1367 (Fed. Cir. 2020).................................................................................. 26

*E-Pass Techs., Inc. v. 3Com Corp.*,
    473 F.3d 1213 (Fed. Cir. 2007).................................................................................... 6

*In re Fought*,
    941 F.3d 1175 (Fed. Cir. 2019).................................................................................. 25

*Function Media, L.L.C. v. Google, Inc.*,
    708 F.3d 1310 (Fed Cir. 2013).................................................................................... 28

*Harris Corp. v. IXYS Corp.*,
114 F.3d 1149 (Fed. Cir. 1997)...................................................................................24

*Hoganas AB v. Dresser Industries, Inc.*,
9 F.3d 948 (Fed. Cir. 1993)......................................................................................13

*Honeywell, Int'l, Inc. v. ITT Indus., Inc.*,
452 F.3d 1312 (Fed. Cir. 2006).................................................................................18

*In re Hyatt*,
708 F.2d 712 (Fed. Cir. 1983)...................................................................................12

*Image Processing Techs., LLC v. Samsung Elecs. Co., Ltd.*,
2:16-CV-505, 2017 WL 2672616 (E.D. Tex. June 21, 2017) ...................................13

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
902 F.3d 1372 (Fed. Cir. 2018).................................................................................25

*Interval Licensing v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014).................................................................................23

*JumpSport, Inc. v. Acad., Ltd.*,
No. 6:17-CV-414-RWS-JDL, 2018 WL 4090471 (E.D. Tex. Aug. 28, 2018)........24

*Kinik Co. v. Int'l Trade Comm'n*,
362 F.3d 1359 (Fed. Cir. 2004).................................................................................15

*Lucent Technologies, Inc. v. Gateway, Inc.*,
525 F.3d 1200 (Fed. Cir. 2008).................................................................................13

*Mars, Inc. v. H.J. Heinz Co., L.P.*,
377 F.3d 1369 (Fed. Cir. 2004).................................................................................11

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
800 F.3d 1366 (Fed. Cir. 2015).................................................................................27

*Mformation Techs., Inc. v. Research In Motion Ltd.*,
764 F.3d 1392 (Fed. Cir. 2014)...............................................................................6, 9

*Morris Reese v. Samsung Telecomms. Am., L.P.*,
No. 2:05-CV-415-DF, 2006 WL 6112195 (E.D. Tex. Dec. 5, 2006) ........................24

*Nautilus, Inc. v. Biosig Instruments*,
134 S. Ct. 2120 (2014)..............................................................................................13

*Nautilus, Inc. v. Biosig Instruments*,
Inc., 572 U.S. 898 (2014).....................................................................................22, 28

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008).................................................................................10

*Omega Engr., Inc, v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003).................................................................................11

*Openwave Systems, Inc. v. Apple Inc.*,
808 F.3d 509 (Fed. Cir. 2016)...................................................................................19

*Ormco Corp. v. Align Tech., Inc.*,
  498 F.3d 1307 (Fed. Cir. 2007)..........................................................18

*Personal Audio, LLC v. Togi Ent., Inc.*,
  2014 WL 2796795 (E.D. Tex. June 19, 2014).....................................11

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)..........................................................24

*Process Control Corp. v. Hydreclaim Corp.*,
  190 F.3d 1350 (Fed. Cir. 1999)..........................................................13

*Randall May Intern., Inc. v. DEG Music Prods., Inc.*,
  378 Fed.Appx. 989 (Fed. Cir. 2010)...................................................12

*Ross-Hime Designs, Inc. v. United States*,
  126 Fed. Cl. 299 (2016) .....................................................................29

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017)..........................................................23

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995)............................................................14

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)..........................................................21

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)............................................................14

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015)....................................................26, 27

*WMS Gaming, Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999)..........................................................28

*Zadro Prods., Inc. v. SDI Techs., Inc.*,
  No. 17- 1406(WCB), 2019 WL 10252726 (D. Del. June 19, 2019).........25

## I.     INTRODUCTION

Google LLC ("Google") hereby submits its opening claim construction brief for U.S. Patent Nos. RE47,200 (the "'200 patent"); 8,054,777 (the "'777 patent"); and 8,179,913 (the "'913 patent"). Google provides constructions that follow the intrinsic evidence and refrains from proposing constructions where the intrinsic record does not require it. Further, some of the terms that Google has identified have no ascertainable meaning and, thus, are indefinite. L2 Mobile Technologies LLC's ("L2MT") proposals, on the other hand, are inconsistent with the intrinsic record, thereby violating the fundamental canons of claim construction. While L2MT's constructions add ambiguity where none exists, Google's constructions clarify the claim terms to follow the teachings in the patents' specifications and prosecution histories.

## II.    TECHNICAL BACKGROUND

### A.     U.S. Patent No. RE47,200

The asserted claims of the '200 patent relate to setting a security count value associated with a security key for a new channel during a process referred to as a "security mode reconfiguration." A security key is used to ensure that communications between users of wireless communications devices are private and are not able to be intercepted and decoded by unwanted individuals. These communications are made over channels that connect wireless communications devices between users. A channel has an associated security key and a security count value. Security keys and security count values were known in the art before the '200 patent. Dkt. No. 1-3, '200 patent at 2:58-6:5 (describing the prior art).

To ensure the reliability of the security key, the wireless communications device must change the security key periodically, which is known as a "security mode reconfiguration." *Id*. at 9:52-60. In order to determine when to change the security key, the wireless communications device uses a security count value that is increased incrementally until it reaches a specified

threshold value, similar to a counter. *Id*. at 7:61-8:15. When the security count value reaches this threshold value, the wireless communications device changes the old security key to a new security key and sets a new initial security count value for that new security key. *Id*. at 7:61-8:15; 9:52-10:41. During the "security mode reconfiguration," the security key for each established channel is changed in this manner to a new security key. *Id*. at 9:52-10:41.

The security keys for the established channels are not changed simultaneously. Therefore, during the "security mode reconfiguration," there may be some established channels using the old security key (that are waiting to be changed) and some that are using the new security key (those that have completed the change to the new security key). *Id*. at 5:49-6:5. During this "security mode reconfiguration" time, when some channels use the old key and some channels use the new key, the wireless communications device may need to establish a new channel for communications. *Id*. The wireless communications device needs to assign that new channel a security key and a security count value.

In ordinary circumstances, when a new channel is established, the established channels are all using one security key with the corresponding security count value. But if a new channel needs to be established during a "security mode reconfiguration," there are multiple security keys and security count values, because not all established channels have changed over to the new security key. *Id*. at 5:49-6:5. The patent describes this extremely rare scenario—when the system wants to add a new channel ***while*** the established channels are undergoing a key change—and attempts to address this problem by claiming a method and apparatus for assigning a security count value. The patent states that the wireless communications device should look at the established channels that are using the ***new*** security key and corresponding security count value when assigning the security key and security count value to this new channel. This makes sense, because the wireless

communications device should not be assigning the new channel an old security key or an old security count value, since the device is already in the process of converting all old keys and count values to the new key and count value.

The '200 patent contends that this is important, because otherwise, the new channel may be assigned an old security count value that is very close to the threshold, thereby requiring the wireless communications device to have to change the security key more frequently. *Id*. at 5:49-6:5. Since the security count values associated with established channels using the new key are lower than security count values associated with established channels using the old key, a longer period of time is required to reach the predefined threshold value, which dictates when the security key is changed. *Id*. Thus, the life span of the new security key is extended. *Id*.

The process of using a security count value (i.e., a counter) to determine when to change the old security key to a new security key was well known in the art and was incorporated in the 3rd Generation Partnership Project (3GPP) standard. *Id*. at 2:58-6:5 (describing the prior art). It was also well known in the art that when establishing a new channel, the new channel needs to be associated with a security key and a security count value. The rare scenario of assigning a new channel a security count value during the "security mode reconfiguration" was also known in the art. *Id*. at 5:49-6:5. The invention, however, allegedly clarifies that the security count value for the new channel should be the new security count value and not the old security count value.

### B.    U.S. Patent No. 8,054,777 and U.S. Patent No. 8,179,913

The third generation (3G) mobile communications system utilizes a Wideband Code Division Multiple Access (WCDMA) wireless air interface access method for a cellular network. Dkt. No. 1-2 at 1:25-27. WCDMA can provide high frequency spectrum utilization, universal coverage, and high quality, high speed multimedia data transmission between wireless communications devices. The WCDMA method also meets various Quality of Service ("QoS")

requirements simultaneously, providing diverse flexible two-way transmission services and better communication quality to reduce transmission interruption rates. *Id.* at 1:30-34.

3GPP is a standards organization that sets forth requirements for wireless communication devices to communicate using WCDMA. For example, 3GPP defines various protocol stacks, such as Radio Link Control ("RLC"). *Id.* at 1:35-40. An RLC is a layer used within the 3GPP protocols, whose tasks include things such as error correction (due to noise, unpredictable channel variations, etc.), re-ordering of data, and re-establishment (explained below).

In addition, the 3G mobile communications system also provides different levels of transmission quality and can operate in different corresponding modes such as Acknowledged Mode (AM), Unacknowledged Mode (UM), and Transparent Mode (TM). *Id.* at 1:42-47. AM is appropriate for use in services with low requirements for real-time transmission, but high requirements for data accuracy. *Id.* at 1:50-52. In AM, the RLC layer combines a transmitting side and a receiving side, and in AM, the RLC supports retransmission of erroneous packets. The '913 and '777 patent are directed to AM.

While the '777 and '913 patents share a nearly identical specification, they are each directed to different aspects of AM—the '777 patent is directed to a re-establishment procedure and the '913 patent is directed to a reset procedure.

      1.      <u>'777 Patent</u>

The '777 patent purports to be "relate[d] to a wireless communication system operating in AM, and is utilized to re-establish the receiving side accurately, so as to improve wireless transmission efficiency and prevent system errors." *Id.* at 4:37-40. The AM RLC can be configured to deliver and/or receive data through downlink and uplink channels. In general, when the receiving side of an AM RLC entity receives data, it performs a number of tasks, such as detecting whether the data received are in duplication, reorders data if they are received out of sequence,

and detects the loss of data at lower layers (and requests retransmissions to its peer AM RLC entity). During a process call "re-establishment," the receiving side of the RLC entity reassembles data units that are received out of sequence and delivers them to another layer within the protocol stack and abandons any remaining data units that could not be reassembled, while initializing relevant state variables and stopping relevant timers.

### 2. '913 Patent

The '913 patent concerns "handling a variable RLC reset procedure during receiving-side-only re-establishment in a wireless communications system." Dkt. No. 1-1 at 1:20. Specifically, the purported invention of the '913 patent relates to "resetting a reset state variable, used for counting the number of times a RESET protocol data unit is scheduled to be transmitted, during receiving-side only re-establishment." *Id.* at 2:40-46.

The '913 patent is directed to a "reset procedure." During a "reset procedure" all of the state variables are reset to their initial values, the RLC data units are abandoned in the receiving side of the AM RLC entity, and all of the data units that were transmitted before the reset in the transmitting side of the AM RLC entity are also abandoned. The purported invention of the '913 patent is to "timely reset the reset state variable, so as to maintain transmission efficiency, and decrease transmission time." *Id.* at 4:21-24.

## III.   APPLICABLE LEGAL PRINCIPLES

The Court is intimately familiar with the legal principles of claim construction. *E.g., eCeipt, LLC v. Victoria's Secret Stores, LLC*, No. 6:20-CV-747-ADA, 2021 WL 4037599, at *1 (W.D. Tex. Sept. 3, 2021); *Dyfan, LLC v. Target Corp.*, No. W-19-CV-00179-ADA, 2020 WL 8617821, at *2 (W.D. Tex. Nov. 24, 2020). Google identifies additional relevant legal authority in the next section.

## IV.    CLAIM TERMS

### A.    Order Of Method Steps ['200 patent, Claim 10]

| L2MT Construction | Google Construction |
|---|---|
| No particular order is required except as defined by the claim itself. | The steps of the claim must be performed in the recited order. |

The language of Claim 10 for the '200 Patent "as a matter of logic or grammar, requires that the steps be performed in the order written." *Mformation Techs., Inc. v. Research In Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014); *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1028 (Fed. Cir. 2019); *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("[B]ecause the language of most of the steps of its method claim refer to the completed results of the prior step, E-Pass must show that all of those steps were performed in order."). L2MT contends that "[n]o particular order is required except as defined by the claim itself." Google disagrees. The plain language of the claim, along with the specification and the prosecution history, require that the steps be performed in the order they are written. Claim 10 recites:

**10.** A method for calculating an initial security count value for a new channel, the method comprising:

**10(a)** establishing a plurality of established channels in a wireless communications device, wherein each established channel in the wireless communications device has a corresponding security count value and utilizes a first security key:

**10(b)** performing a security mode reconfiguration to change utilization of each of the established channels in the wireless communication device from the first security key to a second security key according to an activation time for each of the established channels,  wherein upon utilization of the second security key by one of the established channels, the corresponding security count value for the one of the established channels is changed, wherein the second security key is a new security key that replaces the first security key      and is different from the first security key:

**10(c)** initiating establishment of a new channel in the wireless communications device;

**10(d)** assigning the second security key to the new channel;

**10(e)** utilizing a first set to obtain a first value, wherein the first set is consisting of corresponding security count values of the established channels in the wireless communications device that utilize the second key, and wherein the first value is at least as great as the x most significant bits (MSBx) of a value in the first set and at least one of the established channels utilizing the first security key: and

**10(f)** setting the MSBx of the initial security count value for the new channel equal to the first value, wherein if the first set is empty, then the first value is set to a first predetermined value.

Starting with the first limitation of claim 10, step 10(a) must be performed before step 10(b). Here, step 10(a) is directed to "establishing a plurality of established channels." Step 10(b) is directed to "performing a security mode reconfiguration to change utilization of each of the established channels." Security mode reconfiguration for each of the established channels cannot occur until the channels are actually *established* in step 10(a). This is confirmed by the specification, which makes clear that the security mode reconfiguration happens "some time later" after channels are established. Dkt. No. 1-3 at 9:55-57 ("***Initially***, a plurality of channels are established, each using the first security key 44k. A security mode command is performed ***some time later*** . . . .") (emphasis added). Accordingly, step 10(b) must be "performed some time later" than step 10(a).

Next, step 10(c) must be performed before step 10(d). Step 10(c) recites "initiating establishment of a new channel in the wireless communications device." Step 10(d) is directed to "assigning the security key to the new channel." Step 10(d) must occur after step 10(c) is complete, because there must be a "new channel" (step 10(c)) before any security key could possibly be "assign[ed]" to the new channel (step 10(d)). The claim language also supports this reading, as step 10(c) claims "a" new channel and step 10(d) claims "the" new channel, requiring that the new channel be established in step 10(c) before step 10(d). There is no support in the specification for assigning a security key to a new channel (step 10(d)) that has not yet begun the process of being "established" (step 10(c)). Indeed, the specification presupposes that the "new channel" exists so

that the system may "assign[]" a security key to the channel. Dkt. No. 1-3 at 8:57-60 ("When establishing a new channel 42 when other channels 42 are already established, the first station 40 first *assigns* a security key to the new channel 42.") (emphasis added). The applicant's statements during prosecution likewise confirm this point—the new channel must already have been initiated *before* the security key is assigned. *See* Ex. A[1] (April 25, 2017 Office Action Response) at 6 (explaining that "the new channel may be *assigned* a second security key") (emphasis added).

Likewise, step 10(d) must occur before step 10(e). Step 10(e) is directed to "utilizing a first set to obtain a first value, wherein the first set is consisting of corresponding security count values of the established channels." The specification states that the security count value is not assigned (step 10(e)) until after the key is assigned (step 10(d)): "The second security key is assigned to the new channel. A first set is *then* used to obtain a first value." Dkt. No. 1-3 at 6:21-22 (emphasis added). Accordingly, step 10(d), which recites "assigning a second security key to the new channel" is performed, and "*then*" step 10(e) is performed, which recites how a "first set" is used to "obtain a first value." The prosecution history also confirms the order: "[T]he new channel may be assigned a second security key (such as the new security key) that is different from that of other established channels. The first station must *next* assign hyper-frame numbers to the new channel." Ex. A (April 25, 2017 Office Action Response) at 6 (emphasis added).

Finally, step 10(e) must occur before step 10(f). Once the first value is obtained from step 10(e), step 10(f) recites that the "MSBx of the initial security count value for the new channel" is then "set[] . . . equal to" the first value. Dkt. No. 1-3 at limitation 10(f). Accordingly, based on the plain language of the claim, the method *cannot* "set[] the MSBx of the initial security count value

---

[1]   All exhibits are attached to the Declaration of Jason Williams, which is contemporaneously filed with Google's Opening Claim Construction Brief.

for the new channel equal to the first value" as recited in step 10(f) ***unless and until*** the "first value" has been "obtain[ed]" in step 10(e). Thus, all the steps of claim 10 must be performed in order.

This claim is similar to other claims that courts have determined require a specific order of steps. For example, in *Mformation Techs.*, the court explained that the claim required that a "connection be established before transmission." *Mformation Techs.*, 764 F.3d at 1399. The court there held the claims must be performed in the recited order, otherwise, "the separate sub-step for establishing a connection would become "superfluous" if we concluded that a connection did not have to be established (completed) before transmission." *Id*. Accordingly, this Court should construe that the "channels" of communication are established (step 10(a)) ***prior*** to any security mode reconfiguration of the same channels (step 10(b)). Otherwise, step 10(a) would be "superfluous" if the Court "concluded that a connection did not have to be established" before the security mode reconfiguration command in step 10(b). *Id*. Likewise, the Court should construe that the method must "initiat[e] establishment" of a "new channel" (step 10(c)) ***prior*** to assigning a security key or security count value to that channel (steps 10(d), (e), and (f)). Otherwise, it would be "superfluous" if the Court concluded a "connection did not have to be established" prior to taking certain actions with respect to the new channel, such as assigning a security key (step 10(d)) or a security count value (steps 10(e), (f)). *See ART+COM Innovationpool GmbH v. Google Inc.*, No. 14-271-RGA, 2015 U.S. Dist. LEXIS 83132, at *26-27 (D. Del. June 26, 2015) (rejecting that the steps can occur "simultaneously" because the claimed "device cannot request higher resolution data for a 'smaller section' [recited in a preceding step] before that section exists"). Google's proposed construction should, therefore, be adopted.

**B.** **"consisting of corresponding security count values of the established channels in the wireless communications device that utilize the second key" ['200 patent, Claims 10, 14]**

| L2MT Construction | Google Construction |
|---|---|
| "containing corresponding security count values of only the established channels in the wireless communication device that utilize the second key" | Plain and Ordinary Meaning |

Google contends the plain and ordinary meaning should apply, whereas L2MT proposes re-writing the entire clause to explicitly include the security count values for *only* "the established channels in the wireless communications device that utilize the second key." With this construction, L2MT essentially adds a disclaimer to the asserted claim 10 where no such explicit disclaimer is found in the intrinsic evidence. The Court should decline to construe this term because it is easily understood by the jury without construction, and there is no reason to depart from the plain meaning as L2MT requests.

This limitation is found in element (e) of claim 10 (as identified above): "utilizing a first set to obtain a first value, wherein the first set is *consisting of corresponding security count values of the established channels in the wireless communication device that utilize the second key*." Accordingly, L2MT is asking the Court to construe what makes up the claimed "first set." But this claim limitation simply requires that the first set consist of the security count values that utilize the second key. The plain and ordinary meaning of each word in this entire proposed term for construction is evident from the word itself. This Court "is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Nothing in this proposed claim term is unreasonably difficult that a jury would not be able to understand.

L2MT's proposed construction attempts to re-write the claims, as it replaces a plainly understood phrase with surplusage. L2MT's construction, for example, adds the word "containing," which could mean that additional information could be part of the claimed "first set," other than security count values. It is unclear what other information L2MT intends to include in this first set other than security count values as set forth in the plain language of the claim. *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1376–77  (Fed. Cir. 2004) (explaining that the term "containing" is "open-ended"). In this regard, L2MT's construction improperly attempts to broaden the claims to allow for information other than security count values to be part of the claimed "first set."

L2MT's construction also adds an explicit disclaimer—"corresponding security count values of *only* the established channels in the wireless communications device that utilize the second key." But since there is no "express disclaimer or independent lexicography in the written description that would justify adding that negative limitation," the Court should reject L2MT's construction. *Omega Engr., Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (reversing a construction that had imported the negative limitation "*but not* strike the center or interior portion of the energy zone" because it lacked support in the specification or prosecution history); *Personal Audio, LLC v. Togi Ent., Inc.*, 2014 WL 2796795, at *15 (E.D. Tex. June 19, 2014) ("As the claims themselves do not require such a negative limitation and the specification does not require the negative limitation, it would be improper to interpret the claims to require "*only one*" interface to perform the three operations.") (emphasis added). Indeed, as in *Omega* and *Personal Audio*, there is nothing so explicit here in the specification or the prosecution history to justify L2MT's request.

### C.     "the first value is at least as great as the x most significant bits (MSBx) of a value in the first set and at least one of the established channels utilizing the first security key" ['200 patent, Claim 10]

| L2MT Construction | Google Construction |
|---|---|
| "The first value is at least as great as the x most significant bits (MSBx) of a value in the first set. In addition, at least one of the established channels utilizes the first security key." | Indefinite |

Claim 10 requires that "the first value is at least as great as the x most significant bits (MSBx) of a value in the first set **and** at least one of the established channels utilizing the first security key." The plain language of the claim shows that the term "first value" must be "at least as great as" two separate items: 1) "the x most significant bits (MSBx) of a value in the first set"; **and** 2) "at least one of the established channels utilizing the first security key." Here, grammatically, the phrase "at least as great as" must apply to the phrase "at least one of the established channels utilizing the first security key," which results in the following word combination: "the first value is at least as great as at least one of the established channels utilizing the first security key." That is the "only reasonable construction," since the phrase "at least as great as" **immediately precedes** the remainder of the clause. *See, e.g., Randall May Intern., Inc. v. DEG Music Prods., Inc.*, 378 Fed.Appx. 989, 997 (Fed. Cir. 2010) ("Moreover, the claim language teaches that the shoulder supporting members should be 'changeable' or 'adjustable': these terms **immediately precede** the term 'shoulder supporting members' and the only reasonable construction, therefore, is that these shoulder supporting members themselves, rather than the entire assembly, should be adjustable or changeable.") (emphasis added).

But this limitation as drafted is nonsensical—a "first *value*" cannot be at least as great as "at least one of at least one of the established *channels* utilizing the first security key." Indeed, a "*value*" cannot be "at least as great as" a "*channel*." *See In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir.

1983) ("A claim must be read in accordance with the precepts of English grammar."); *see also Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("Even 'a nonsensical result does not require the court to redraft the claims of the patent.'") (citing *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350, 1374 (Fed. Cir. 1999)). Accordingly, claim 10 is indefinite for failing "to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments*, 134 S. Ct. 2120, 2124 (2014).

Despite the apparent difficulties in this claim, L2MT attempts to fix the claim through its construction by: 1) ***adding*** terms that do ***not*** currently exist; 2) ***removing*** terms that ***do*** currently exist; and 3) ***revising*** other terms to fit the scope that L2MT desperately desires. Specifically, L2MT's proposed construction would ***add*** a period to splice the problematic clause in half at a stopping point preferable to L2MT, while also simultaneously removing the word "and." But L2MT does not stop there—it further ***adds*** the words "[i]n addition" and ***revises*** the word "utilizing" to "utilizes" so that L2MT can make the claim readable. This directly flouts governing law, as the Federal Circuit "has repeatedly held that courts may not redraft claims to cure a drafting error made by the patentee, whether to make them operable or to sustain their validity." *See Lucent Technologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1215 (Fed. Cir. 2008) (collecting cases). "To do so 'would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention.'" *Id*. (quoting *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993)). Accordingly, the Court should refuse to re-write L2MT's claim and find the claim indefinite. *See, e.g.*, *Image Processing Techs., LLC v. Samsung Elecs. Co., Ltd.*, 2:16-CV-505, 2017 WL 2672616, at *15–16 (E.D. Tex. June 21, 2017) (finding a claim indefinite, as plaintiff's request to insert the phrase "to be included" in the claim would "substantively change[] the meaning of the claim"); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, CV 16-453-RGA,

2018 WL 456035, at *8 (D. Del. Jan. 17, 2018) (finding a claim indefinite, explaining the court "cannot rewrite the patent").

Finally, to the extent L2MT tries to assert that the specification supports its proposed construction, the Court should give this argument little weight. Indeed, even if the words of the claim conflict with the specification, or even make little logical sense, the words of the claim still control. *See, e.g.*, *Chef Am.*, 358 F.3d at 1371–1374 (Fed. Cir. 2004) (interpreting claimed process for making dough as drafted, despite being inoperable). Were it not so, L2MT would be able to ***entirely*** change the scope of its patent years after prosecution. This would be demonstrably unfair to Google and other companies, as Google has not had any notice of this abrupt change in claim scope. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). Thus, the Court should reject L2MT's proposed construction.

### D.    "a first predetermined value" ['200 patent, Claims 10, 11]

| L2MT Construction | Google Construction |
|---|---|
| Plain and Ordinary Meaning | "a first default value" |

Claim 10 requires that "if the first set is empty, then the first value is set to ***a first predetermined value***." Google's proposal matches the intrinsic evidence and provides clarity to the claim, as the specification consistently refers to this term as a "default" value.

"[T]he specification is always highly relevant to the claim construction analysis. Usually, it is ***dispositive***; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (emphasis added)). Here, the specification consistently refers to the predetermined value as a "default" value. *See* Dkt. No. 1-3 at 10:19-21 ("Again, if no such buffers 42r, 42t exist, then the hyper-frame numbers 43r, 43t for the new channel 42 are simply set to a ***default*** value, such as

zero.") (emphasis added). *See also id*. at 9:29-33 ("That is, the first value 45 is given a ***default*** value of zero, which becomes the value for the hyper-frame numbers 43r and 43t. Alternatively, as zero is sometimes used as a flag, another small value, such as one, may be used.") (emphasis added). Accordingly, since "[i]n most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention," Google's construction should be adopted. *Phillips*, 415 F.3d at 1315 (internal quotations omitted).

In contrast, L2MT seeks the plain and ordinary meaning of this claim term. But the specification ***never*** refers to this value as "predetermined" and it never explains what "predetermined" is in the context of the alleged invention. Indeed, the term "predetermined" only appears three times in the specification, and ***none*** of those occurrences has ***anything*** to do with this specific "value." *See* Dkt. No. 1-3 at 4:31, 4:34, and 7:63. By contrast, the specification uses the term "default" consistently and exclusively when describing how to set the first value when the first set is empty. Based on the specification, the claimed "predetermined value" can only mean "default value" in the context of the specification. L2MT's construction clashes with Federal Circuit law because its construction is not "based on the description" as set forth in the specification. *Phillips*, 415 F.3d at 1315 (explaining that the Federal Circuit has "reaffirmed" the point that "the descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims ***must be based on the description***") (emphasis added) (internal quotations omitted)). *See also Kinik Co. v. Int'l Trade Comm'n,* 362 F.3d 1359, 1365 (Fed. Cir. 2004) ("The words of patent claims have the meaning and scope with which they are used in the specification and the prosecution history."). Accordingly, since the specification is "the primary basis for construing the claims," L2MT's construction should be rejected because it lacks any basis in the specification. *Phillips*, 415 F.3d at 1315.

### E.    "only reestablishing the receiving side in the RLC entity of the communications device" ['777 patent, Claims 1 and 2]

| L2MT Construction | Google Construction |
|---|---|
| "reestablishing the receiving side without reestablishing the transmitter side" | "only changing the originally configured values for the RLC entity of the communications device in the receiving side, which is different from a reset procedure" |

Google's proposed construction for "only reestablishing the receiving side of the RLC entity of the communications device" captures the patentee's express disclaimer made during prosecution of the '777 patent at the United States Patent and Trademark Office ("USPTO"). There is no dispute that the asserted claims are directed to a reestablishment procedure, as even L2MT's proposed construction confirms that the claim is directed to "reestablishing." However, the parties dispute what that claimed reestablishment procedure can include. During prosecution, the applicant made explicit concessions on the claimed reestablishment procedure in order to overcome a statutory double patenting rejection. Google's proposed construction seeks to memorialize those concessions in order to prevent L2MT from improperly broadening the scope of the claims to include subject matter the applicants specifically disclaimed.

During prosecution, the examiner issued a non-final rejection of the application that led to the '777 patent. *See* Ex. B (Dec. 26, 2008 Non-Final Rejection). The examiner rejected all the pending claims on the grounds of nonstatutory double patenting based on a co-pending application. *Id*. In order to overcome this rejection, the patentee explained why the subject matter of the copending application (No. 11/591,490) was different from the subject matter in the application that led to the '777 patent. *See* Ex. C (Mar. 26, 2009 Applicant's Arguments/Remarks Made in an Amendment). Specifically, the applicant argued that the application that led to the '777 patent was directed to a ***reestablishment*** procedure while the co-pending application on which the rejection was based is directed to entirely different subject matter, a ***reset*** procedure.

The applicant went into detail regarding his contention that a "re-establishment procedure" was different from a "reset procedure" to overcome the double patenting rejection, and he provided specific disclaimers on that difference:

> *[t]he subject matter of the co-pending [application] is on single-sided reset procedure rather than single-sided re-establishment procedure.* For one [of] ordinary skill, it is clear that *the reset procedure is different from the re-establishment procedure*. For example, in the admitted prior art (3GPP TS 25.322 V6.5.0 (2005-06), "Radio Link Control (RLC protocol specification (Release 6)"), *the two procedures are specified into different sections* (9.7.7 for re-establishment and 11.4 for reset procedure).

> *Specifically, when there is a protocol error, the reset procedure is triggered to recover the protocol error. After the reset procedure, all the state variables, timers and configured values are set to the original states or original configured values*. This is true for double-sided reset (see the APA 3GPP TS 25.322 V6.4.0, section 11.4) and for single-sided reset (see the co-pending application, the cited claims by the examiner.)

> *On the other hand, when the network wants to change the original configured values for the RLC entity, the network initiates a re-establishment procedure. After the re-establishment procedure, the configured values of the RLC entity change to the newly configured values*. This is always true for single-sided re-establishment (see the APA 3GPP TS 25.322 V6.4.0, section 9.7.7 and the instant application.) . . . For the instant application, the applicant is only interested in single-sided re-establishment. Therefore, it is always true that a single-sided re-establishment is different from a single-sided reset.

> *Besides the configured values after the procedures, there are other two differences*, which are true for both single-sided and double-sided: *(1) The reset procedure is triggered by the RLC entity itself, while the re-establishment is triggered by the upper layer of the RLC entity. (2) The contents of the commands or signaling for the two procedures are different*. The RESET PDU comprises a HFNI value to synchronize the HFN values between the two peers and the receiving RLC entity needs to respond with a RESET ACK PDU again containing a HFNI value of the other communicating direction. On the other hand, the content of the re-establishment comprises reconfigured values. The receiver treats the re-established side(s) as a newly established one and applies the new configured values. No response back to the transmitter is needed for the RLC entity of the receiver. (Therefore, the re-establishment is classified as a function specified in section 7 of the AP A because there is no "procedure" involved between the transmitter and the receiver from the RLC entity point of view.)

> ***With the above clarification, one can be sure that a re-establishment is different from a reset.*** Therefore, there is no double patenting issue for the instant application and the copending application.

Ex. C (Mar. 26 2009 Applicant Arguments/Remarks Made in an Amendment) (emphasis added).

The applicant made clear to the Examiner that the claimed "reestablishment procedure" involves "chang[ing] the original configured values for the RLC entity . . . to the newly configured values." *Id*. While the reset procedure, as argued by the applicant, involves a "procedure [] triggered to recover the protocol error," after which "all the state variables, timers and configured values are set to the original states or original configured values." *Id*. As shown above, the applicants stated repeatedly that these two procedures are ***different***. *Id*. Google's proposed construction comes directly from the applicant's only definition of "reestablishing."

If the claims were to cover a reset procedure, then the entire purpose of the alleged invention would be negated and the claims would be subject to statutory double patenting—the claims are clearly directed to a "reestablishment procedure" and not a "reset procedure," as confirmed by the applicant. *See, e.g.*, *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149-50 (Fed. Cir. 2012) (specification's consistent disparaging remarks regarding prior art sensors with external cables and wires limited scope of term); *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313 (Fed. Cir. 2007) (limiting claim term based, in part, on "a primary objective" of the invention). Here, the applicant's statements during prosecution were a clear disavowal that the claims are ***not*** directed to a reset procedure. *See In re Abbott Diabetes*, 696 F.3d at 1149-50 (finding an implicit disavowal of the use of external cables or wires in the claimed electrochemical sensor as patentee "repeatedly, consistently, and exclusively" depicted the sensor as not using external cables); *see also Ch. Bd. Options Exch., Inc. v. Int'l Sec. Exch.*, LLC, 677 F.3d 1361, 1372–73 (Fed. Cir. 2012) ("derogatory statements" about prior art system "may be viewed as a disavowal of that subject matter from the scope of the Patent's claims") (citing *Honeywell, Int'l,*

*Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1319); *Openwave Systems, Inc. v. Apple Inc.*, 808 F.3d 509, 516-517 (Fed. Cir. 2016) (finding disclaimer because of "repeated disparagement of mobile devices with 'computer modules'" in specification).

L2MT's proposed construction does not address the disclaimed subject matter during prosecution and does not provide further clarity on the scope of the asserted claims. L2MT proposes adding the disclaimer "without reestablishing the transmitter side," but this construction improperly broadens the claim beyond the scope of the invention. The claims, as drafted, include the word "only," which limits the reestablishing to "only" "the receiving side in the RLC entity." By removing the word "only," L2MT is now attempting to broaden the claim to potentially cover other types of reestablishment. Further, as explained in detail above, L2MT's construction does not properly explain what "reestablishing" means in the context of the invention and the prosecution history. Google's proposed construction, however, provides a clear definition of "reestablishing" that comes directly from the applicant. Accordingly, Google requests the Court adopt its proposed construction.

**F.      "reestablishing the receiving side" ['777 patent, Claims 1 and 2]**

| L2MT Construction | Google Construction |
|---|---|
| "executing a procedure that includes resetting state variables specified for the receiver side to their initial values and setting configurable parameters to their configured values" | "changing the originally configured values for the RLC entity in the receiving side, which is different from a reset procedure" |

L2MT's proposed construction for "reestablishing the receiving side" illustrates the concern that Google raises above with respect to "only reestablishing the receiving side of the RLC entity of the communications device." *See supra* Section IV.E. L2MT's construction for "reestablishing the receiving side" improperly attempts to reclaim claim scope that the applicant specifically disclaimed during prosecution. As set forth in detail above in Section IV.E, the

applicant of the '777 patent explained in no uncertain terms that a reset procedure is different from reestablishment procedure. *Id.* Yet in L2MT's proposed construction, L2MT attempts to reclaim that disclaimed claim scope to state that reestablishing can include resetting. What makes L2MT's proposed construction even more troubling is that the resetting that it includes in its proposed construction is ***exactly*** what the applicant said was ***not*** included in the claim. L2MT wants the Court to construe this term to include "resetting state variable . . . to their initial values," but the applicant made clear that this was not part of the claim scope, but was instead part of the reset procedure, which it said was different from a reestablishment procedure:

> ***After the reset procedure***, all the state variables, ***timers and configured values are set to the original states*** or original configured values . . . .
>
> ***On the other hand,*** when the network wants to change the original configured values for the RLC entity, the network initiates a re-establishment procedure. ***After the re-establishment procedure, the configured values of the RLC entity change to the newly configured values.***
>
> *        *        *
>
> ***With the above clarification, one can be sure that a re-establishment is different from a reset.*** Therefore, there is no double patenting issue for the instant application and the copending application.

Ex. C (Mar. 26 2009 Applicant Arguments/Remarks Made in an Amendment) (emphasis added).

Google's proposed construction, however, stays true to the applicant's statements during prosecution. Similar to its construction for "only reestablishing the receiving side of the RLC entity of the communications device," which Google explains in detail above in Section IV.E, Google's construction here comes directly from the applicant's statements regarding a reestablishment procedure. Accordingly, Google requests the Court adopt its proposed construction.

G.      **"Move Receiving Window (MRW) Acknowledgement (ACK) Status PDU"**
        **['777 patent, Claims 1 and 2]**

| L2MT Construction | Google Construction |
|---|---|
| "a Status PDU including an indication of MRW ACK" | Plain and Ordinary Meaning |

Google does not believe this term needs to be construed and that it should be afforded its plain and ordinary meaning. The plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313. That is certainly the case here. Indeed, claim terms are construed according to their plain and ordinary meaning unless the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Neither situation applies here.

L2MT's proposed construction of "a Status PDU including an indication of MRW ACK" is wrong. The claims and the specification are consistent that the MRW ACK is a "packet data unit" or "PDU." The claims refer to this as the MRW ACK *PDU*. And the specification consistently refers to the MRW ACK as a *PDU*: "when the RLC entity only re-establishes the receiving side, the preferred embodiment of the present invention discards the control *PDU* (ACK/NACK, Change Window Size, and MRW ACK STATUS PDU, and RESET ACK PDU) corresponding to the receiving side . . . ." *E.g.,* Dkt. No. 1-2 at 5:53-57 (emphasis added); *id.* at 5:43-46 ("the *control PDUs* corresponding to the receiving side comprise the ACK/NACK, Change Window Size, and MRW ACK STATUS PDUs . . . .") (emphasis added).

L2MT, however, wants to change the claim language so as to remove the requirement that the MRW ACK be a PDU. Under L2MT's construction, the MRW ACK is an "indication" that is included in a status PDU. It is unclear what "indication" means in this context, but it is clear that

L2MT's construction reads out the requirement that the MRW ACK is a PDU. Such a construction conflicts with the plain language of the claim and the specification. Accordingly, L2MT's proposed construction is unhelpful and unnecessarily injects ambiguity into the claims. This term should be given its plain and ordinary meaning.

### H.   "accurately reestablishing the receiving side" ['777 patent, Claim 2]

| L2MT Construction | Google Construction |
|---|---|
| No construction is necessary; the proposed term/phrase is only present in the preamble of the claim and therefore the claim term/phrase is nonlimiting. | Indefinite |

The term "accurately reestablishing the receiving side" is indefinite because it does not, when "viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty" regarding what it means to "accurately" reestablish. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

The '777 patent does not provide any objective boundaries for the term "accurately" when used in conjunction with "reestablishing the receiving side." *See, e.g.*, Dkt. No. 1-2 at 3:8-11 ("an RLC entity of the communications device having a transmitting side and a receiving side, utilized for accurately reestablishing the receiving side."); *id.* at 2:51-56 ("the MRW SUFI PDU cannot be retransmitted, such that the SDU discard process cannot be accurately executed in the transmitting side"); *id* at 437-40 ("The present invention relates to a wireless communication system operating in Acknowledged Mode, and is utilized to re-establish the receiving side accurately, so as to improve wireless transmission efficiency and prevent system errors."); 5:58-65 ("Thus after re-establishing only the receiving side, the system can accurately execute an MRW process. Likewise, in another embodiment of the present invention, the RESET PDU is not discarded, such that after the receiving side has been re-established, the system can accurately execute a RESET process to

improve system efficiency"); *id.* at 6:4-9 ("Thus, the present invention provides the process of only re-establishing the receiving side of the RLC layer, which not only increases the efficiency of wireless resource use, but also makes related process (such as RESET and discard SDU processes) execute more accurately."). Because this term of degree is not adequately described in the specification, the asserted claims containing this term are invalid for being indefinite. *Interval Licensing v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014) (holding for terms of degree that the intrinsic record "must provide objective boundaries for those of skill in the art" for the terms to be valid).

The Federal Circuit's opinion in *Berkheimer* is instructive. In *Berkheimer,* the Federal Circuit found a similar term of degree—"minimal"—to be indefinite because the specification lacked any objective boundaries or examples of what actually constitutes "minimal." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363-64 (Fed. Cir. 2018). Here, as in *Berkheimer*, the preamble of claim 2 of the '777 patent merely recites "accurately" resulting in "claim language [that] is not reasonably clear as to what level [of reestablishment] . . . is acceptable" to qualify as "accurate." *Id.* at 1363. Since the specification never describes this term, the "specification contains no point of comparison for skilled artisans to determine an objective boundary" for this term. *Id.* at 1364 (citing *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1379 (Fed. Cir. 2017)). Indeed, one way to think of accurately is that it requires minimal inaccuracy. But there is no way to determine what is sufficiently minimal and what is sufficiently accurate.

L2MT's alternate construction of "correctly" suffers from the same infirmity and should be rejected for similar reasons. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004). Specifically, L2MT's alternate construction of "correctly" does not provide any clarity for the meaning of the word "accurately" and, in fact, injects similar ambiguity. Indeed, rather than

clarifying the claim term, L2MT's unsupported construction "require[s] one to inquire" what it means to "correctly reestablish." *See JumpSport, Inc. v. Acad., Ltd.*, No. 6:17-CV-414-RWS-JDL, 2018 WL 4090471, at \*11 (E.D. Tex. Aug. 28, 2018). Further, L2MT's proposed construction gives no indication on how the word "correctly" limits the term "reestablishing the receiving side." Thus, as there is also no intrinsic support for such a construction; to the contrary, L2MT's ambiguous "correctly" terminology would inject new and unnecessary sources of confusion and dispute regarding claim scope and should accordingly be rejected. *See Morris Reese v. Samsung Telecomms. Am., L.P.*, No. 2:05-CV-415-DF, 2006 WL 6112195, at \*16 (E.D. Tex. Dec. 5, 2006) (declining to adopt a construction that included a new term that "would itself introduce unnecessary ambiguity and require further construction"); *see also Harris Corp. v. IXYS Corp*., 114 F.3d 1149, 1152 (Fed. Cir. 1997) (Where, as here, proposed language "contribute[s] nothing but meaningless verbiage to the definition of the claimed invention," it should be rejected.").

Nor is there any validity to L2MT's apparent argument that the Court can avoid this issue because the preamble is non-limiting. It is well-established that when a preamble recites essential structure or steps or is necessary to give meaning to a claim, it is limiting. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Further, the dependence on a preamble phrase for antecedent basis indicates a reliance on the preamble to define the claimed invention. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed. Cir. 2002). As described with respect to claim 2 of the '777 patent, the preamble provides antecedent basis for the terms found throughout claim 2, including "reestablishing the receiving side." *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371, (Fed. Cir. 2020) (holding the preamble as a whole was limiting because "language relied upon for antecedent basis . . . [was] intertwined with the rest of the preamble"). For example, the term "accurately reestablishing the receiving

side" is part of the preamble phrase that purportedly explains protocols for receiving side only re-establishment of a communications device. *E.g.,* Dkt. No. 1-2, claim 2 ("only reestablishing the receiving side in the RLC entity of the communications device."). Because the claim drafters chose to use both the preamble and the body of the claim to allegedly define the subject matter of the claimed invention, the preamble should be construed as limiting. *Bell Commc'ns, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 621 (Fed. Cir. 1995); *see also, In re Fought,* 941 F.3d 1175, 1178 (Fed. Cir. 2019) ("We have repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim.").

In sum, the term "accurately" is a limitation of claim of 2 of the '777 patent, but it is impossible for one having ordinary skill to understand the dividing line between "accurate" and inaccurate. This term is therefore indefinite for depending on "the unpredictable vagaries of [a POSITA's] opinion." *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (holding "'optimiz[ing] . . . QoS'" indefinite as it is "a 'term of degree' that . . . is 'purely subjective' and . . . 'fails to provide one of ordinary skill in the art with any way to determine whether' QoS has been 'optimiz[ed].'" (citation omitted)); *Zadro Prods., Inc. v. SDI Techs., Inc.*, No. 17- 1406 (WCB), 2019 WL 10252726, at *3 (D. Del. June 19, 2019) (finding indefiniteness where specification and the claims "provide[] no guidance as to what . . . would satisfy" the claim term).

## I.   "control circuit" ['777 patent, Claim 2; '913 patent, Claim 3]

| L2MT Construction | Google Construction |
|---|---|
| No separate construction necessary.<br><br>Alternatively, if the term is determined to be means-plus-function, it should be construed as follows:<br><br>**Function:** realizing functions of the communications device | Indefinite, 112 ¶ 6<br><br>**Function**: "for realizing functions of the wireless communications device" ('777 patent) "for realizing functions of the communications device" ('913 patent) |

| | |
|---|---|
| **Structure:** hardware and/or software that includes a processor that executes program code accessible from a memory, as disclosed in Figures 1-3 and the text of the specification describing those figures | **Structure**: none disclosed (Indefinite) |

The dispute between the parties is whether the term "control circuit" is subject to Section 112, ¶ 6 and indefinite for failure to disclose a corresponding structure. To determine whether Section 112, ¶ 6 applies, the threshold inquiry is "whether the words of the claim are understood by [POSITAs] to have a sufficiently definite meaning as the name of the structure." *Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1348 (Fed. Cir. 2015). Though absence of the word "means" creates a rebuttable presumption that a term is not a means-plus-function limitation, Section 112, ¶ 6 applies when the claim term: (i) "fails to recite sufficiently definite structure," or (ii) "recites functions without reciting sufficient structure for performing that function." *Id.* at 1349. Importantly, "[t]he question is not whether a claim term recites any structure but whether it recites sufficient structure—a claim term is subject to section 112(f) if it recites function without *reciting sufficient structure* for performing that function." *Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020).

The first part of this inquiry is whether the claims are subject to Section 112, ¶ 6, which requires determining whether a POSITA would understand the term "control circuit" to have sufficient definite meaning. It does not. As explained below, the specification is entirely silent as to what the claimed "control circuit" is in the context of the alleged invention. The specification indicates that a control circuit is "program code" and "central processing unit," but this disclosure does not connote sufficient structure to avoid means-plus-function treatment.[2] But, as this Court

---

[2]   The specification also discloses "memory," but again, memory does not add any meaningful structure. The memory simply indicates where the "code" is stored; it does not convey any

has explained, applicants cannot "*simply recite two nonce words—'processor' and 'code'*—together in order to essentially write the claim in a means-plus-function format without being subject to § 112, ¶ 6." *Dyfan, LLC v. Target Corp.*, No. W-19-CV-00179-ADA, 2020 WL 8617821, at *6 (W.D. Tex. Nov. 24, 2020). The same is true here for "control circuit" in claim 2.[3]

Further, L2MT's reliance on "program code" in its proposed construction as somehow defining specific structure in view of the detailed functional tasks recited in the body of the claim is also fatally flawed. That claim 2 of the '777 patent, for example, requires the "program code" to perform a multitude of different functions, demonstrates that "program code" amounts to nothing more than a generalized catch-all for whatever algorithms may perform the recited functions. *See, e.g., Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (applying Section 112, ¶ 6 because "the claims simply state that the 'compliance mechanism' *can perform various functions*"); *Williamson*, 792 F.3d at 1350 (applying Section 112, ¶ 6 when the claim language "replaces the term 'means' with the term 'module' and *recites three functions* performed by the 'distributed learning control module'"). Accordingly, the claimed "control circuit" is subject to Section 112 ¶ 6.

Given that the "control circuit" is subject to Section 112 ¶ 6, then the dispute between the parties is what structure or algorithm is disclosed to perform the agreed upon claimed function of "realizing functions of a wireless communications device." The specification does not disclose any

---

structural specificity to a "control circuit." According to the specification, a processor, memory, and program code are black-box placeholders requiring specific algorithms to perform the recited functions. Dkt. No. 1-2 at 4:45-52 ("a control circuit 106, a central processing unit (CPU) 108, a memory 110, a program code 112, and a transceiver 114 of the communications device 100. In the communications device 100, the control circuit 106 executes the program code 112 in the memory 110 through the CPU 108, thereby controlling an operation of the communications device 100.").
[3]   The '913 patent contains similar language in claim 3 and thus the analysis and citations for the '777 patent equally apply to the '913 patent.

structure for "control circuit." Rather, the patents depict the "control circuit" as an empty rectangle box without any real structural detail (*E.g.,* Dkt. No. 1-2 at Fig. 1), and state that the processor executes various computer program instructions that are stored in memory. Entirely absent from the disclosure—and necessary under the law—is a description of algorithms, routines, or instructions by which to perform the claimed functions. Critically, the disclosed structure must be "the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). It is equally "well settled that simply disclosing software[, like a computer program] without providing some detail about the means to accomplish the function is not enough." *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed Cir. 2013). Since the patents fail to define any structure or algorithm for "control circuit," the term is invalid for indefiniteness as it fails to inform with reasonable certainty what is claimed. *Nautilus*, 572 U.S. 898 at 910.

**J.    "reset procedure" ['913 patent, Claims 1 and 3]**

| L2MT Construction | Google Construction |
|---|---|
| Plain and ordinary meaning | "a procedure triggered to recover a protocol error in which all state variables, timers and configured values are set to their original states or original configured values, which is different from a reestablishment procedure" |

Google's proposed construction for the claimed "reset procedure" comes directly from the applicant's own definition of "reset procedure" in traversing the statutory double patenting rejection described in detail above in Section IV.E. The inventor of the '777 and the '913 patent is the same—Mr. Sam Shiaw-Shaing Jiang. And both patents claim priority to provisional applications that were filed around the same time—the '777 patent claims priority to a provisional application filed Sept. 21, 2005, and the '913 patent claims priority to a provisional application filed May 3, 2006. It is clear from the file histories of these patents that the applicant was working

on technology related to a reestablishment procedure and technology related to a reset procedure at that time. This is also clear from other co-pending applications that the applicant filed around the same time. For example, the applicant also filed Application No. 11/591,490 on November 4, 2005, that is directed to a reset procedure. *See* Ex. C (Mar. 26, 2009 Applicant's Arguments/Remarks Made in an Amendment). Accordingly, statements that the applicant made in the '777 patent file history are informative in understanding the scope of the technology the applicant was developing at that time. *Ross-Hime Designs, Inc. v. United States*, 126 Fed. Cl. 299, 325 (2016).

As explained in detail above, *see supra* Section IV.E, the applicant provided a definition of a "reset procedure" during prosecution when he was clarifying why the claimed "reestablishment procedure" of the '777 patent was different from a "reset procedure." *Id*. In defining a "reset procedure," the applicant stated that "[a]fter the reset procedure, all the state variable, timers and configured values are set to the original states or original configured values." *Id*. Google's proposed construction for "reset procedure" comes ***directly*** from this statement.

The concern that Google explained in detail for the '777 patent applies equally here. Without a specific construction for this term that accounts for the applicant's understanding of a reestablishment procedure and a reset procedure, L2MT will conflate a "reset procedure" with a "reestablishment procedure" to improperly broaden the claim scope. This is not just a speculative concern; L2MT's intentions are apparent from its infringement contentions, which highlight the need for the Court to construe the terms Google presented for these two patents related to the applicant's disclaimer.

As explained in detail above, the '777 patent is directed to a "reestablishment procedure," as evidenced by (i) L2MT's own proposed construction, (ii) the title of the '777 patent—"Method

and Apparatus for Handling control PDUs *During Re-Establishing* . . .”—and (iii) the applicant's statements during prosecution. *See supra* Section IV.E. On the other hand, the '913 patent is directed to a “reset procedure,” as evidenced by (i) the preamble stating that the claims are a method and system for a “reset procedure” and (ii) the title of the '913 patent—“Method and Apparatus of Handling Variable of RLC *Reset Procedure* . . . .” Yet, in its infringement contentions, L2MT points to the same section of the 3GPP standard as satisfying both the claimed reestablishment procedures in the '777 patent and the claimed reset procedures in the '913 patent. *Compare* Ex. D (Infringement contentions) at Ex. 1 at 4 (relying on Section 9.7.7 of TS 25.322 for infringement of the '913 patent) with Ex. D at Ex. 2 at 3 (relying on Section 9.7.7 of TS 25.322 for infringement of the '777 patent. This is especially problematic, because the applicant specifically stated that a reestablishment procedure and a reset procedure are directed to *two different sections of TS 25.322*:

> [t]he subject matter of the co-pending [application] is on single-sided reset procedure rather than single-sided re-establishment procedure.  For one [of] ordinary skill, it is clear that the reset procedure is different from the re-establishment procedure.  *For example, in the admitted prior art (3GPP TS 25.322 V6.5.0 (2005-06), “Radio Link Control (RLC protocol specification (Release 6)”), the two procedures are specified into different sections (9.7.7 for re-establishment and 11.4 for reset procedure).*

*See* Ex. C (Mar. 26, 2009 Applicant's Arguments/Remarks Made in an Amendment).

While the applicant stated that Section 9.7.7 of TS 25.322 discloses the reestablishment procedure, the applicant stated that Section 11.4 of TS 25.322 discloses the reset procedure. But as shown in the infringement contentions, L2MT relies on Section 9.7.7 to contend Google infringes both the '777 patent, which is directed to a reestablishment procedure, and the '913 patent, which is directed to a reset procedure. For the same reasons set forth above for the '777 patent claim terms, Google requests that the Court adopt Google's construction for this claim term.

Dated:  November 2, 2021

*     /s/   Paige Amstutz*
Paige Arnette Amstutz
Texas State Bar No. 00796136
SCOTT, DOUGLASS & MCCONNICO, LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
Telephone: (512) 495-6300
Facsimile: (512) 495-6399
pamstutz@scottdoug.com

Charles K. Verhoeven (*pro hac vice*)
charlesverhoeven@quinnemanuel.com
Andrea Roberts (pro hac vice)
andreaproberts@quinnemanuel.com
 QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel : 650-801-5000
Fax: 650-801-5100

Kevin Hardy (*pro hac vice*)
kevinhardy@quinnemanuel.com
Deepa Acharya
deepaacharya@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
Tel: 202-538-8000
Fax: 202-538-8100

*Attorneys for Defendant Google LLC*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on November 2, 2021, all counsel of record who have appeared in this case are being served with a copy of the foregoing via email.

Dated:  November 2, 2021             _____*/s/ Paige Amstutz*_____

**Paige Amstutz**