**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| L2 MOBILE TECHNOLOGIES LLC, | |
| Plaintiff | Civil Action No. 6:21-cv-00358-ADA |
| v. | The Honorable Alan D. Albright |
| GOOGLE LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

**PLAINTIFF L2 MOBILE TECHNOLOGIES LLC'S
<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     RELEVANT CLAIM CONSTRUCTION PRINCIPLES ................................................. 1

III.    THE PERSON OF ORDINARY SKILL IN THE ART .................................................. 1

IV.     THE DISCLOSED INVENTIONS OF THE ASSERTED PATENTS ............................. 1

V.      CLAIM TERMS ........................................................................................................ 2

        A.  Order of Method Steps ['200 Patent Claim 10] ........................................... 2

        B.  "consisting of corresponding security count values of the established channels
            in the wireless communications device that utilize the second key" ['200
            patent, Claims 10, 14] ................................................................................ 6

        C.  "the first value is at least as great as the x most significant bits (MSBx) of a
            value in the first set and at least one of the established channels utilizing the
            first security key" ['200 patent, Claim 10] ................................................ 6

        D.  "a first predetermined value" ['200 patent, Claims 10, 11] ........................ 11

        E.  "only reestablishing the receiving side in the RLC entity of the
            communications device" ['777 patent, Claims 1 and 2] ............................... 12

        F.  "reestablishing the receiving side" ['777 patent, Claims 1 and 2] ............. 12

        G.  "Move Receiving Window (MRW) Acknowledgement (ACK) Status PDU"
            ['777 patent, Claims 1 and 2] ...................................................................... 17

        H.  "accurately reestablishing the receiving side" ['777 patent, Claim 2] ........ 18

        I.  "control circuit" ['777 patent, Claim 2; '913 patent, Claim 3] ................... 22

        J.  "reset procedure" ['913 patent, Claims 1 and 3] ......................................... 25

VI.     CONCLUSION .......................................................................................................... 29

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Labs. v. Dey L.P.*,
   287 F.3d 1097 (Fed. Cir. 2002) ............................................................................. 27

*Apex Inc. v. Raritan Comp., Inc.*,
   325 F.3d 1364, 1373 (Fed. Cir. 2003) .................................................................... 23

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
   919 F.3d 1320 (Fed. Cir. 2019) ............................................................................. 20

*Catalina Marketing Intern. Inc. v. Coolsavings. com, Inc.,*
   289 F. 3d 801 (Fed. Cir. 2002) .............................................................................. 18

*Chef America Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) ............................................................................. 10

*Core Wireless Licensing S.A.R.L. v. L.G. Elecs. Inc.*,
   No. 2:14-cv-0911, 2015 WL 6956722 (E.D. Tex. Nov. 9, 2015)............................ 22

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada),*
   809 F.3d 1223 (Fed. Cir. 2015) ............................................................................... 7

*Energizer Holdings, Inc. v. ITC*,
   435 F.3d1366 (Fed. Cir. 2003) .............................................................................. 20

*Flash-Control, LLC v. Intel Corp*.,
   No. 1:19-CV-1107-ADA, 2020 WL 4561591 (W.D. Tex. July 21, 2020)............... 20

*Hyatt. In re*,
   708 F.2d 712 (Fed. Cir. 1983) ............................................................................... 10

*Innovative Sonic Ltd. v. Research In Motion Ltd.*,
   2012 WL 4928897, Case No. 11-cv-0706 (N.D. Tex., Oct. 17, 2012).................... 12

*Intellicheck Mobilisa, Inc. v. Honeywell Intl. Inc.*,
   C16-0341JLR, 2017 WL 6550700  (W.D. Wash. Dec. 21, 2017)........................... 22

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ............................................................................. 11

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ............................................................................... 11

*Linear Tech. Corp. v. Impala Linear Corp.*,
   379 F.3d 1311 (Fed. Cir. 2004) ........................................................................ 22

*Liquid Dynamics Corp. v. Vaughan Co.*,
   335 F.3d 1361 (Fed. Cir. 2004) ........................................................................ 11

*Loral Fairchild Corp. v. Sony Corp.*,
   181 F.3d 1313 (Fed. Cir. 1999) .......................................................................... 3

*Mantech Envtl. Corp. v. Hudson Envtl. Services, Inc.*,
   152 F.3d 1368 (Fed. Cir. 1998) .......................................................................... 3

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) ............................................................................................ 9

*Marrin v. Griffin*,
   599 F.3d 1290 (Fed. Cir. 2010) ........................................................................ 19

*Mass. Inst. of Tech. and Elec. For Imaging, Inc. v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006) ........................................................................ 22

*Media Rights Techs. Inc. v. Capital One Fin. Corp.*,
   800 F.3d 1366 (Fed. Cir. 2015) ................................................................... 22, 24

*Microsoft Corp. v. i4i Limited Partnership*,
   131 S. Ct. 2238 (2011) ........................................................................................ 7

*Nautilus, Inc. v. Biosig Instr., Inc.*,
   134 S.Ct. 2120 (2014) ...................................................................................... 7, 9

*Northern Telecom, Inc. v. Datapoint Corp.*,
   908 F.2d 931 (Fed. Cir. 1990) .......................................................................... 12

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .......................................................................... 3

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
   182 F.3d 1298 (Fed. Cir. 1999) .......................................................................... 3

*Randall May Intern., Inc. v. DEG Music Prods., Inc.*,
   378 Fed. Appx 989 (Fed. Cir. 2010) ................................................................. 10

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420, 1427–28 (Fed. Cir. 1997) ........................................................ 23

*Seattle Box Co., v. Industrial Crating & Packing, Inc.*,
   731 F.2d 818 (Fed. Cir. 1984) .......................................................................... 21

*Symantec Corp. v. Comput. Assocs. Int'l*,
    522 F.3d 1279 (Fed. Cir. 2008) ........................................................................ 18, 19

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ........................................................................ 22, 24

**Statutes**

35 U.S.C. § 112 ...................................................................................................... 22

35 U.S.C. § 282 ........................................................................................................ 7

**EXHIBIT LIST**

| Number | Description |
|--------|-------------|
|        | Declaration of Dr. Edwin Hernandez-Mondragon ("Hernandez Decl.") |
| 1      | Reproduction of asserted claims containing disputed claim language |
| 2      | U.S. Patent No. RE47,200 |
| 3      | U.S. Patent No. 8,179,913 |
| 4      | U.S. Patent No. 8,054,777 |
| 5      | Excerpts of 3rd Generation Partnership Project, Technical Specification 25.331 v3.7.0 (2001-06) |
| 6      | Excerpts of The AMERICAN HERITAGE COLLEGE DICTIONARY (Houghton Mifflin Co., 3d Ed. 1993) |
| 7      | Excerpts of U.S. Patent No. 6,925,183 File History |
| 8      | Excerpts of U.S. Patent No. 8,054,777 File History |
| 9      | Excerpts of 3rd Generation Partnership Project, Technical Specification 25.322 v6.4.0 (2005-06) |
| 10     | Excerpts of THE MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (McGraw-Hill, 1994) |
| 11     | Excerpts of 3rd Generation Partnership Project, Technical Specification 25.322 v6.7.0 (2006-03) |

I.      **INTRODUCTION**

Plaintiff L2 Mobile Technologies LLC ("L2MT") accuses Defendant Google, Inc.'s ("Google") "Pixel" line of smartphones of infringing U.S. Patent No. RE47,200, U.S. Patent No. 8,179,913, and U.S. Patent No. 8,054,777 (the "Asserted Patents"). L2MT's constructions of disputed terms are correct and fully supported by the patents' intrinsic evidence and the controlling law. To explain the technology and provide the perspective of one skilled in the art, L2MT provides the testimony of its expert, Dr. Edwin Hernandez-Mondragon.

Google's additional contention that certain asserted terms are indefinite should be rejected. The challenged claims' plain language more than delineate their scope with reasonable clarity.

II.     **RELEVANT CLAIM CONSTRUCTION PRINCIPLES**

Given the Court's familiarity with the law of claim construction, L2MT cites specific law in the below discussion where pertinent.

III.    **THE PERSON OF ORDINARY SKILL IN THE ART**

L2MT asserts that a person of ordinary skill in the art ("POSITA") relevant to the technologies involved in the Asserted Patents would hold at least a bachelor's degree in computer science, electrical engineering, or a related technical subject, and have at least two years of experience working with wireless communications devices and protocols, including the 3G wireless communications standard. Additional education could substitute for some of the work experience and vice versa. (Hernandez Decl., ¶19.)

IV.     **THE DISCLOSED INVENTIONS OF THE ASSERTED PATENTS**

Dr. Hernandez provides an overview of the relevant technology and the inventions disclosed in the Asserted Patents. (*Id.*, ¶¶ 21–45.) That discussion is not repeated here.

## V.     CLAIM TERMS

### A.     Order of Method Steps ['200 Patent Claim 10]

| L2MT's Construction | Google's Construction |
|---|---|
| No particular order is required except as defined by the claim itself. | The steps of the claim must be performed in the recited order. |

Google asserts that the steps of claim 10 must be performed in their recited order, but the claims do not require such rigidity. Google cites cases addressing particular claim steps as to which, as a matter of logic, the prior recited step must be completed before the next recited step could be performed. From its analysis of claim 10 of the '200 patent, however, Google concludes only that step 10(a) must occur before step 10(b), and that step 10(c) must occur before steps 10(d), (e), and (f). (Dkt. 35 at 9.) Even if the Court were to accept that analysis, this would not justify Google's proposed construction implying that *all* steps of claim 10 must be performed, i.e. initiated and completed, in the order recited.

Although L2MT agrees that some steps must be performed before others, certain steps can be done in parallel with or before previously recited steps. The claimed invention as a whole, the remaining intrinsic evidence, and Google's own assertions demonstrate this. Indeed, Google itself characterizes the disclosed invention of the '200 patent as addressing a circumstance in which the steps for establishing a new channel and its associated security key and security count value are performed while the steps for changing over the security key for previously established channels to a new security key are ongoing. (*Id.* at 1–3.)

For this claim dispute, as well as certain others, L2MT has submitted the declaration of its expert Dr. Hernandez. A court may receive extrinsic evidence in the form of expert testimony to educate itself about the invention and the relevant technology, or to establish that a term in the patent has a particular meaning in the pertinent field. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318

(Fed. Cir. 2005); *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308–09

(Fed. Cir. 1999).

Claim 10 of the '200 patent recites the following steps:

10. A method for calculating an initial security count value for a new channel, the method comprising:

**[10(a)]** establishing a plurality of established channels in a wireless communications device, wherein each established channel in the wireless communications device has a corresponding security count value and utilizes a first security key:

**[10(b)]** performing a security mode reconfiguration to change utilization of each of the established channels in the wireless communication device from the first security key to a second security key according to an activation time for each of the established channels, wherein upon utilization of the second security key by one of the established channels, the corresponding security count value for the one of the established channels is changed, wherein the second security key is a new security key that replaces the first security key and is different from the first security key:

**[10(c)]** initiating establishment of a new channel in the wireless communications device;

**[10(d)]** assigning the second security key to the new channel;

**[10(e)]** utilizing a first set to obtain a first value, wherein the first set is consisting of corresponding security count values of the established channels in the wireless communications device that utilize the second key, and wherein the first value is at least as great as the x most significant bits (MSBx) of a value in the first set and at least one of the established channels utilizing the first security key: and

**[10(f)]** setting the MSBx of the initial security count value for the new channel equal to the first value, wherein if the first set is empty, then the first value is set to a first predetermined value.

Unless the steps of a method actually recite an order, the steps are not ordinarily construed

to require one. *Loral Fairchild Corp. v. Sony Corp.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999) (stating

that "not every process claim is limited to the performance of its steps in the order written"). Such

a result, however, can ensue when the method steps implicitly require that they be performed in

the order written. *See id.*; *Mantech Envtl. Corp. v. Hudson Envtl. Services, Inc.*, 152 F.3d 1368,

1376 (Fed. Cir. 1998) (finding that "the sequential nature of the claim steps is apparent from the

plain meaning of the claim language and nothing in the written description suggests otherwise").

L2MT agrees that step 10(a) must be performed before 10(b) because the purpose of performing a security mode reconfiguration in step 10(b) is to change the security key of already established channels from a first key to a second key. Step 10(b), however, does not need to be completed before step 10(c) of "initiating establishment of a new channel . . . ." Google does not argue that step 10(b) must be completed before step 10(c) is initiated. To the contrary, Google emphasizes that the invention can address a circumstance in which the establishment of a new channel is initiated (step10(c)) while during the security mode reconfiguration of established channels (step 10(b)) is being performed. (Dkt. 35 at 1–3.)

With respect to step 10(d) ("assigning the second security key to the new channel"), the relevant specification passage cited by Google confirms that this is part of the process of establishing the new channel. (Ex. 2 at 8:57–60 ("When establishing a new channel 42 when other channels 42 are already established, the first station 40 first assigns a security key to the new channel 42.").) L2MT therefore agrees that step 10(d) must occur after step 10(c). However, step 10(c) recites "initiating the establishment of a new channel;" it does not recite completing the establishment of a new channel. Thus, to the extent that Google's confusing assertions insinuate that step 10(d) can only occur after the process of establishing the new channel is complete, this too contrasts with the actual claim language. Rather, the claim language and specification also encompass the situation in which the second security key is assigned to the new channel during the process of establishing the new channel.

Step 10(e) relates to obtaining a "first value" utilizing a "first set [] consisting of corresponding security count values of the established channels . . . that utilize the second key. . . ." Step 10(e), therefore, logically can occur at any time after the security mode reconfiguration of

step 10(b) is performed for at least some established channels such that there are some established channels using the second key. Step 10(e) could occur any time after the process of establishing a new channel is initiated in step 10(c), and this could be before, during, or after the second security key is assigned to the new channel in step 10(d). The first value is obtained entirely independent of assigning the second key to the new channel in step 10(d).

Claim step 10(e) also indicates that "at least one of the established channels utiliz[es] the first security key." Thus, the first value is obtained (using security count values of established channels that utilize the second key) at a time when at least one of the established channels is still utilizing the first security key. This additional temporal aspect is clear from the claim itself.

With respect to step 10(f) ("setting the MSBx of the initial security count value for the new channel. . ."), because the initial security count value of the new channel is being set using the first value of step 10(e), it follows that 10(f) is performed after 10(e). However, these two steps can logically occur any time after the process of establishing the new channel is initiated in step 10(c). In other words, they can occur before, during, or after step 10(d) is performed.

In sum, various steps of claim 10 can be performed in parallel or entirely out of their recited order. Google's proposed construction requiring all steps to be performed in their recited order must therefore be rejected. Here, the proper sequencing of the claim steps is clear from the language of claim 10 itself such that it is unnecessary for the Court to address this during claim construction.

**B.**    **"consisting of corresponding security count values of the established channels in the wireless communications device that utilize the second key" ['200 patent, Claims 10, 14]**

| L2MT's Construction | Google's Construction |
|---|---|
| "including corresponding security count values of the established channels in the wireless communication device that utilize the second key but excluding security count values of the established channels that utilize the first key." [1] | Plain and Ordinary Meaning |

L2MT proposed this language for construction to provide the jury guidance on the meaning and effect of the phrase "consisting of" in patent parlance. As evident from Google's brief, it does not appear that the parties have a true dispute. L2MT can accept the plain and ordinary meaning of this language given Google's agreement that the first set contains only security count values of the established channels in the wireless communications device that utilize the second key. (Dkt. 35 at 10–11.)

**C.**    **"the first value is at least as great as the x most significant bits (MSBx) of a value in the first set and at least one of the established channels utilizing the first security key" ['200 patent, Claim 10]**

| L2MT's Construction | Google's Construction |
|---|---|
| "The first value is at least as great as the x most significant bits (MSBx) of a value in the first set. In addition, at least one of the established channels utilizes the first security key." | Indefinite |

Google's indefiniteness position requires parsing the disputed claim language in a way that does not make sense while ignoring the more plausible reading that renders the claim entirely clear and definite. A patent is invalid for indefiniteness only "if its claims, read in the light of the

---

[1] L2MT notes that Google's brief incorrectly identifies L2MT's proposed construction. (Dkt. 35 at 10.) L2MT provided a modified construction for this term on October 19, 2021, with its disclosure of extrinsic evidence. The construction that Google identifies for L2MT was an earlier proposed construction that was replaced by the construction identified herein.

specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instr., Inc.,* 134 S.Ct. 2120, 2124 (2014). Google further must overcome the presumption of validity of the disputed claims. 35 U.S.C. § 282. Thus, Google must prove its "indefiniteness" contentions by clear and convincing evidence. *Microsoft Corp. v. i4i Limited Partnership,* 131 S. Ct. 2238, 2242 (2011); *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 809 F.3d 1223, 1227 (Fed. Cir. 2015). Google fails to conduct the required analysis and has not established any indefiniteness defect in this claim language.

This language of claim step 10(e) involves two separate albeit related aspects. These two aspects are easily understood in the context of claim 10 as a whole, which, as explained above, involves setting an initial security count value for a new channel while performing a security mode reconfiguration to change the security key for previously established channels to a second security key. The first aspect requires: "utilizing a first set to obtain a first value. . . wherein the first value is at least as great as the x most significant bits (MSBx) of a value in the first set." The first value is obtained using a first set of security count values of the established channels that utilize the second key (i.e., established channels that have already been reconfigured to the second key). The second aspect requires: "at least one of the established channels utilizing the first security key." In context, this is understood to indicate that the first value is obtained at a time when at least one established channel is still utilizing the first security key (i.e., an established channel that has not yet been reconfigured to the second key).

Google's indefiniteness argument mashes the separate aspects of the claim language together to arrive at a meaning that was never intended. In doing so, Google would require the first value must be at least as great as: (1) "the x most significant bits (MSBx) of the value in the first

set, and (2) "at least one of the established channels utilizing the first security key." Google asserts that this reading renders the claim nonsensical. But that does not demonstrate claim indefiniteness, but only that Google is parsing the claim language incorrectly.

Google ignores *Nautilus'* mandate that one must look to the patent itself for guidance when addressing claim definiteness. As Google acknowledges, the '200 patent's purpose is to avoid mishandling of security keys in the situation where different channels are using different security keys while establishing a new channel. This problem is magnified when there are established channels still using the first security key. (Ex. 2 at 5:51–56.) In this situation, if a new channel is assigned a starting count for the security key based on security key counts for channels using the old security key, this would artificially shorten the security key's usage. (*Id.* at 5:49–6:5.)

The specification unambiguously discloses a solution to this problem that involves obtaining a first value using a first set that has only security count values of the established channels that utilize the second key. The first value is at least as great as the x most significant bits (MSBx) of a value in the first set, and the initial security count value for the new channel is set to the first value (or if the first set empty it is set to predetermined value such as zero). (*See* Ex. 2 at Abstract; 6:21–28.) The specification also unambiguously states that this process occurs in the context of at least one of the established channels still utilizing the first security key. (*Id.* at Abstract; 6:19–21.)

The claim language itself is entirely consistent with these aspects of the disclosed invention. Step 10(b) recites reconfiguring established channels from a first to a second security key and step 10(c) recites initiating the process of establishing a new channel. Step 10(e) recites "utilizing a first set to obtain a first value, wherein the first set is consisting of corresponding security count values of the established channels . . . that utilize the second key." Just as in the

specification, 10(e) goes on to indicate that "the first value is at least as great as the x most significant bits (MSBs) of a value in the first set . . . ." and step 10(g) involves setting the "MSBx of the initial security count for the new channel equal to the first value" obtained using a first set of security count values. The additional language in step 10(e) regarding at least one of the established channels utilizing the first security key is also entirely understandable in the context the disclosure, and provides the further context that the first value is determined while at least one established channel is utilizing the first security key.

Not surprisingly, nowhere does the specification disclose Google's notion that the first value used to set the initial security count of the new channel is at least as great as an established channel. Google admits as much in its brief but asks that the Court ignore the overall context and language of the claim and clear teaching of the specification to adopt its nonsensical reading of the claim language. Google's approach does not establish indefiniteness under the principles of *Nautilus*.

Google also fails to address how a POSITA would understand the language as required by *Nautilus*, which recognized the importance of expert analysis regarding indefiniteness challenges. *Id.* at 2130 (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996) ("claim construction calls for 'the necessarily sophisticated analysis of the whole document,' and may turn on evaluations of expert testimony.")). As explained by Dr. Hernandez, a person skilled in the art with knowledge of the 3G standard and in view of the specification would understand that the first value is at least as great as the x most significant bits (MSBx) of a value in the first set, and not also at least as great as one of the established channels as Google asserts. The 3G standard that existed just before the invention included a specification for calculating the start value of the security counter. (Hernandez Decl. at ¶¶ 64–72.) The start value was determined by evaluating the

most significant bits of the security count values for other established channels. (*Id*.) The standard at the time of the invention said nothing about calculating the start value to also be at least as great as "channels," as Google proposes. (*Id*.)

The cases Google cites are inapposite. In *Randall May Intern., Inc. v. DEG Music Prods., Inc*., the parties disputed the grammatical structure of the claim. 378 Fed. Appx 989, 997 (Fed. Cir. 2010). To resolve the grammatical dispute, the Federal Circuit looked to the language of the claims, the specification, and the prosecution history. *Id*. Here, as discussed above, the grammatical structure of step 10(e) plainly supports L2MT's reading, especially when the full claim and specification are considered. Google also relies on *In re Hyatt* for the proposition that a claim must be read in accordance with the precepts of English grammar. 708 F.2d 712 (Fed. Cir. 1983). But again, Google cannot demonstrate that the grammatical structure only allows for Google's nonsensical reading of step 10(e).

Google further argues that the Court may not rewrite the claims, relying on *Chef America Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004). In *Chef America*, however, the claim was susceptible to only one reasonable interpretation after review of the intrinsic record. *Id.* at 1374. L2MT offers a construction only in response to Google's unfounded assertions that the language has no understandable meaning. L2MT's construction merely applies the understanding a skilled artisan would have when reading the claim in the context of the specification as required by the governing caselaw. L2MT would not object if the Court does not believe the language requires construction. But Google's implausible reading and baseless indefiniteness challenge must be rejected.

### D.    "a first predetermined value" ['200 patent, Claims 10, 11]

| L2MT's Construction | Google's Construction |
| --- | --- |
| Plain and Ordinary Meaning | "a first default value" |

This phrase was proposed by Google, but there is no ambiguity of language requiring construction. *See, e.g.*, *Liquid Dynamics Corp. v. Vaughan Co.*, 335 F.3d 1361, 1367 (Fed. Cir. 2004). The purpose of claim construction is to clarify legitimate ambiguities, not to simply rewrite the claims using different words. *See, e.g., K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905 (Fed. Cir. 2004) (finding no ambiguity in the proposed term and declining to construe it). Google does not establish any ambiguity about the term "a first predetermined value" or its use in the claims, let alone how replacing that term with "a first default value" would provide clarity.

The meaning of the word "predetermined" is well-established and confirmed in dictionary definitions, for example: "[t]o determine, decide, or establish in advance" (Ex. 6, AMERICAN HERITAGE COLLEGE DICTIONARY 1077 (1993)). "Predetermined" does not limit "predetermined value" to being a "default value." Google does not define "a first default value" and thus would create ambiguity where the was none.

Google provides no legitimate reason for limiting the claim by importing "default value" from the specification into the claim. Google asserts that the specification never refers to the value as "predetermined" and that it uses the term "default" consistently and exclusively when describing how to set the first value when the first set is empty. (Br. at 15.) Even if those assertions were accurate, this would not justify rewriting the chosen claim language. Google cites no case (there is none) holding that the claims must be interpreted to incorporate the exact terminology used in the specification.

Moreover, the '200 patent was a reissue of U.S. Patent No. 6,925,183 ("the '183 patent"). The application leading to the '183 patent contained an original claim set that recited "the first value is set to a first predetermined value." (Ex. 7.) The original claims of a patent application are part of the patent specification. *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 938 (Fed. Cir. 1990). Therefore, Google's argument that specification never refers to setting the first value to a predetermined value is incorrect.

Finally, Google's exact claim construction and argument was already proposed and rejected in *Innovative Sonic Ltd. v. Research In Motion Ltd.*, 2012 WL 4928897, Case No. 11-cv-0706, *11 (N.D. Tex., Oct. 17, 2012). *Innovative Sonic* involved the '183 patent, which is the patent from which the '200 patent reissued. After consideration of arguments just like Google's, the *Innovative Sonic* court refused to construe "a first predetermined value" beyond its plain and ordinary meaning. *Id*. The same result is proper here.

**E.** **"only reestablishing the receiving side in the RLC entity of the communications device" ['777 patent, Claims 1 and 2]**

| L2MT's Construction | Google's Construction |
|---|---|
| "reestablishing the receiving side without reestablishing the transmitter side" | "only changing the originally configured values for the RLC entity of the communications device in the receiving side, which is different from a reset procedure" |

This phrase is the more complete phrase in which the next claim phrase is contained. Therefore, L2MT addresses this and the following phrase together in Section F.

**F.** **"reestablishing the receiving side" ['777 patent, Claims 1 and 2]**

| L2MT's Construction | Google's Construction |
|---|---|
| "executing a procedure that includes resetting state variables specified for the receiver side to their initial values and setting configurable parameters to their configured values" | "changing the originally configured values for the RLC entity in the receiving side, which is different from a reset procedure" |

The parties dispute (1) whether the term "only" relates to reestablishing only the receiving

side and not the transmitter side as L2MT proposes, or whether "only" limits reestablishment to changing configured values for the RLC entity and nothing else as Google proposes, (2) how to describe the process of "reestablishing," and (e) the appropriateness of importing the negative limitation "which is different from a reset procedure" to distinguish a reestablishing procedure from a reset procedure.

With respect to the first issue, Google's brief confirms that the word "only" in this step of claims 1 and 2 of the '777 patent limits the reestablishing to only the receiving side in the RLC entity. (Br. at 19.) L2MT's construction for this term precisely addresses this point, and Google cannot dispute this aspect of L2MT's proposed construction.

On the second issue, both parties propose a description of "reestablishing." Only L2MT's construction is complete and correct in light of the intrinsic record and supporting extrinsic evidence. The '777 specification discloses that during a reestablishment procedure, several state variables are reset and configurable parameters are set. (*See*, *e.g.*, Ex. 4 at 2:6–14 ("If the receiving side of the RLC entity is being reestablished, *reset state variables* (VR(R), VR(H), and VR(MR)) corresponding to a receiver; *set configurable protocol parameters* (Configured_Tx_Window_Size and Configured_Rx_Window_Size) corresponding to the receiver to accurate values.") (emphasis added).)

During prosecution of the '777 patent, the applicant further described what "reestablishment" includes:

> There are two kinds of values to be dealt with during a reset procedure and a re-establishment procedure. They are: (1) state variables (such as VR(R), VR(H), VR(MR), VT(S), VT(A), etc.) and (2) configurable parameters (such as (Configured_Tx_ Window_Size, Configured_Rx_ Window_Size, MaxDat, Poll_PDU, MaxMRW, etc.) Both kinds of values are specified in the current specification and also in the Standard.

> In a reset procedure, the RLC entity resets the state variables to their initial values and **resets** the **configurable parameters** to the ( originally) configured values (because in a

reset procedure, no value is configured).

> In a re-establishment procedure, the RLC entity **resets** the state variables to their initial values and **sets** the **configurable parameters** to the (newly) **configured values**.

(Ex. 8, 11/27/2009 Response (emphasis in original).) Therefore, consistent with the '777 specification, the applicant explained that a reestablishment procedure involves both state variables and configurable parameters, and further that during a reestablishment procedure the RLC entity resets state variables to their initial values and sets configurable parameters to newly configured values. (*Id.*)

L2MT's construction is consistent with these statements in the '777 patent and its prosecution history in that it addresses both state variables and configurable parameters. In contrast, Google's construction is incomplete at least because it only addresses "originally configured values" and does not mention state variables. Nor does it reflect that reestablishment involves resetting state variables to their initial values, whereas configurable parameters are set to their configured values.

Google attempts to draw support for its construction from a different statement made by the applicant during prosecution of the '777 patent. (Ex. 8, 3/26/2009 Response ("On the other hand, when the network wants to change the original configured values for the RLC entity, the network initiates a re-establishment procedure. After the re-establishment procedure, the configured values of the RLC entity change to the newly configured values.").) This statement, however, was plainly not intended to be a complete description of what reestablishment involved. Rather, the statement simply distinguished a particular aspect of reestablishment and reset procedures and explain what happens to configurable values in a reestablishment procedure. The applicant's statement did specifically address state variables, but it is clear from the applicant's later statement that reestablishment involves also resetting state variables. Nothing in the

14

applicant's statements during prosecution indicated that reestablishment categorically does not involve state variables. Such a conclusion would be inconsistent with the specification, prosecution history, and common understanding of a POSITA.

Indeed, as explained by Dr. Hernandez, the version of the 3G standard that existed at the time of the invention shows that the reestablishment procedure involves both configurable values and state variables. (Hernandez Decl. at ¶ 84.) In particular, the technical standard document 3GPP TS 25.322 v 6.4.0 (2005-06), which was released shortly before the September 2005 priority date of the '777 patent, describes the process for reestablishing the receiving side of an RLC entity. (*See* Ex. 9.) Section 9.7.7 entitled "RLC re-establishment function for acknowledged and unacknowledged mode" states:

- if the receiving side of the RLC entity is re-established:
  - reset the ***state variables*** specified for the receiver . . . to their initial values;
  - set the ***configurable parameters*** applicable for the receiving side . . . to their configured values

(*Id.* at Section 9.7.7.) This demonstrates that one skilled in the art would understand that a reestablishment procedure involves resetting state variable to their initial values and setting configurable values to their configured values, precisely what L2MT proposes for its construction.

Google's construction does not address state variables and is therefore erroneously incomplete. According to Google, including a reference to resetting state variables to their initial values is what the applicant said was not included in the claim. That assertion misrepresents the import of the applicant's comments in the March 26, 2019 Response, which pointed out a difference between the two procedures without ever indicating that reestablishing does not included resetting state variables to their initial values. (Ex. 8, 3/26/2009 Response.) It also ignores the remarks in the subsequent November 27, 2009 response plainly indicating that reestablishing does involve resetting state variables to their initial values (*Id.*, 11/27/2009 Response), which is

also indisputable from both the specification and the 3GPP standard.

Moreover, Google misapplies the word "only" in the claim language to assert that reestablishing the receiving side" involves "only" changing the originally configured values for the RLC entity of the communications device in the receiving side. Google's construction would limit the reestablishing procedure in the claim to the single step of only changing originally configured values, which is wrong for all the reasons above.

Regarding the third dispute, Google's proposed inclusion of the negative limitation "which is different than a reset procedure" is unnecessary and improper. Google emphasizes statements made by the applicant during prosecution of the application for the '777 patent after claims had originally been rejected for obviousness-type double patenting based on claims in another application relating to a resetting procedure on exchanges that occurred. (Dkt. 35 at 16–17.) The applicant's remarks did in fact point out differences between the two procedures to aid the examiner's understanding, and the double patenting rejection was overcome. L2MT does not dispute that reestablishing the receiving side of an RLC entity is a different procedure than resetting an RLC entity or that some differences were mentioned during prosecution. However, Google provides no legitimate justification for complicating the claims with a negative limitation that reestablishing the receiving side is different from a reset procedure.

Google's purported justification is that if the claims "were to cover a reset procedure," then the purpose of the invention "would be negated" because the claims are directed to reestablishment and not reset. (*Id.* at 18) However, the issue is not what the '777 patent claims "cover" but what their steps require. It is undisputed that the steps of the '777 patent claims involve reestablishing the receiving side of an RLC entity. They do not require performing the resetting procedure discussed during the prosecution history. It does not follow, however, that the claims do not

16

"cover" a method that performs the recited reestablishment steps and also performs a resetting procedure. Google's insistence on a negative limitation distinguishing a resetting procedure would open the door to erroneous arguments that the claims do not cover anything that involves a reset procedure.

This is especially problematic because a reestablishment procedure is not entirely different than a reset procedure. As discussed above, there are similarities in the two procedures and nothing in the prosecution suggests otherwise. For example, in both procedures, state variables are reset to their original values. During prosecution, the applicant pointed to differences between the two procedures but did not characterize them as different in all respects. (Ex. 8, 3/26/2009 Response; 11/27/2009 Response.)

Therefore, Google's negative limitation is unnecessary, would only confuse the jury, and should be rejected.

G.    **"Move Receiving Window (MRW) Acknowledgement (ACK) Status PDU"** ['777 patent, Claims 1 and 2]

| L2MT's Construction | Google's Construction |
|---|---|
| "a Status PDU including an indication of MRW ACK" | Plain and Ordinary Meaning |

This language is contained within the claim limitation, "wherein the first control PDU corresponding to the receiving side is a Move Receive Window (MRW) Acknowledgement (ACK) Status PDU."  L2MT's construction would clarify this highly technical jargon in a manner entirely consistent with the patent specification. The '777 patent specification discloses the following:

> the [3G specification] separates the control PDUs into three broad categories: 1) STATUS PDUs and Piggybacked STATUS PDUs, 2) RESET PDUs, and 3) RESET ACK PDUs. The first type of control PDU is primarily comprised of a header (for indicating the type of PDU), one or a plurality of super fields (SUFI), and a PAD. By setting information carried by the SUFIs, *the STATUS PDU and the Piggybacked STATUS PDU can become one of the following types*:
> . . .
> 4. MRW ACK: Report sent to the receiver from the transmitter to acknowledge that the

transmitter has already received a STATUS PDU comprising an MRW.

(Ex. 4 at 4:3–23 (emphasis added).) Thus, a STATUS PDU becomes an MRW ACK type of STATUS PDU based on the information carried in the SUFIs. L2MT's proposed construction reflects this, clarifying that the MRW ACK Status PDU is a type of status PDU that includes an indication of MRW ACK (i.e., carries an MRW ACK SUFI).

Google objects only on the basis that L2MT's construction supposedly would eliminate the requirement that the MRW ACK Status PDU be a PDU. That is not the case; the construction expressly indicates that it is a Status PDU.

Accordingly, the Court should adopt L2MT's construction.

**H.     "accurately reestablishing the receiving side" ['777 patent, Claim 2]**

| L2MT's Construction | Google's Construction |
| --- | --- |
| No construction is necessary; the proposed term/phrase is only present in the preamble of the claim and therefore the claim term/phrase is nonlimiting.<br><br>Alternatively, "correctly reestablishing the receiving side" | Indefinite |

The Court should reject Google's assertion that "accurately reestablishing the receiving side" renders claim 2 of the '777 patent indefinite. This language of the preamble does not limit the claim and therefore cannot render the claim scope indeterminate. Even if it were a claim limitation, the term "accurately" does not prevent one of ordinary skill in the art from understanding what is claimed.

A preamble generally is not limiting if the patentee defines a "structurally complete invention in the claim" and only states a purpose or intended use for the invention in the preamble. *Catalina Marketing Intern. Inc. v. Coolsavings. com, Inc.,* 289 F. 3d 801, 808 (Fed. Cir. 2002). On the other hand, a preamble generally does limit a claim if it recites "essential structure or steps" or

is "necessary to give life, meaning, and vitality to the claim." *Symantec Corp. v. Comput. Assocs. Int'l*, 522 F.3d 1279, 1288–89 (Fed. Cir. 2008). Relying on the preamble to distinguish prior art or provide antecedent basis for a limitation recited later in the claim may indicate that the preamble is limiting. *Id*. at 1289. Applying these guideposts, the language "accurately reestablishing the receiving side" in the preamble of claim 2 is not a claim limitation.

The body of claim 2 recites a structurally complete invention even without this language. The recited structure is a control circuit, a central processing unit executing program code to operate the control circuit, and memory for storing the program code. The preamble introduces the wireless communications device that comprises these components and recites a Radio Link Control (RLC) entity of the device. However, the preamble does not recite any essential structure or steps that are not positively recited in the claim itself. In addition, the applicant did not rely on the preamble to distinguish over prior art or to provide antecedent basis.

The preamble language "utilized for accurately reestablishing the receiving side" states a purpose or intended use of the device. This language is not recited in or directly relied upon in the body of claim 2. Although the body of the claim relies on recitation of "Radio Link Control (RLC) entity" in the preamble for antecedent basis of "the RLC entity" in the body, and also refers to "the wireless communications device" mentioned in the preamble, this is not a reason for limiting the body of the claim to "accurately" reestablishing the receiving side. The Federal Circuit has expressly held that "the mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim." *Marrin v. Griffin*, 599 F.3d 1290, 1295 (Fed. Cir. 2010). The *Marrin* decision cites several additional cases in which a preamble recited structural components that were part of the claim but the purpose recited in the preamble was not. *Id*. Thus, reliance on the preamble for antecedent

basis of "RLC entity" or "wireless communications device" does not result in the intended use recitation of "accurately reestablishing the receiving side" being included as a claim limitation.

A preamble is not limiting if the claim defines a structurally complete invention in the claim body, such that deletion of the disputed phrase from the preamble would not affect the structural definition or operation of the invention itself. *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1329 (Fed. Cir. 2019). Taking that approach here, deletion of the phrase "utilized for accurately reestablishing the receiving side" from claim 2's preamble would not affect the structural definition or operation of the claimed device. The body of the claim then states "only reestablishing the receiving side in the RLC entity of the communication device." As the specification confirms, it was well known by those skilled in the art at the time of the invention that a procedure existed in the 3G standard for reestablishing only the receiving side of an RLC entity. (Ex. 4 at 1:53–2:17.) The Federal Circuit has made clear that antecedent basis is satisfied so long as "the scope of a claim would be reasonably ascertainable by those skilled in the art." *Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370–71 (Fed. Cir. 2003); *see also Flash-Control, LLC v. Intel Corp.*, No. 1:19-CV-1107-ADA, 2020 WL 4561591, *11–12 (W.D. Tex. July 21, 2020) (declining to find a claim indefinite where missing explicit antecedent basis did not prevent a POSITA from understanding the limitation). Thus, one of ordinary skill would understand the body of the claim without reference to the "utilized for accurately reestablishing the receiving side" language of preamble which strongly indicates that the language itself is not limiting.

Even if this preamble phrase is deemed limiting, the term "accurately" does not render the claim indefinite. Google provides mere lawyer argument that those skilled in the art would not know what it means to accurately reestablish. Google ignores the '777 patent specification, which describes an example of reestablishment that would not be accurately performed:

> ***When only the receiving side is being reestablished, the prior art discards all of the control PDUs of the receiving side and the transmitting side, which may cause an error in operation of the system***. For example, a Move Receiving Window Super-Field (MRW SUFI) PDU of an SDU discard command has already been transmitted before the receiving side is reestablished, but has been lost in the transmission process, because the prior art discards all of the control PDUs when only the receiving side is being reestablished, the MRW SUFI PDU cannot be retransmitted, ***such that the SDU discard process cannot be accurately executed in the transmitting side***.

(Ex. 4 at 2:42–61 (emphasis added).) Additionally, as explained by Dr. Hernandez, one skilled in the art would understand that "accurately" in the context of claim 2 refers to completing a reestablishment procedure without causing system errors. (Hernandez Decl. at ¶ 91.)

Moreover, "accurately" is not a term of degree as Google asserts. Google cites no cases where "accurately" was found to be a term of degree. L2MT's alternative construction describes exactly what a person skilled in the art would understand accurately to mean – "correctly reestablishing the receiving side." Even if accurately were a term of degree, a term of degree does not render claim indefinite as long as a person skilled in the art can objectively understand the scope of the claim. And, the fact that claim language, including terms of degree, may not be precise, does not automatically render the claim indefinite. *Seattle Box Co., v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). Words of degree or approximation, such as "substantially," are sufficiently definite so long as one of ordinary skill in the art would understand what is claimed when read in light of the specification. *Id*. Here, one skilled in the art can understand accurately as reflecting a reestablishment process that is performed correctly without errors.

For these reasons, Google's indefiniteness challenge to claim 2 of the '777 patent should be rejected.

## I.   "control circuit" ['777 patent, Claim 2; '913 patent, Claim 3]

| L2MT's Construction | Google's Construction |
|---|---|
| No separate construction necessary.<br><br>Alternatively, if the term is determined to be means-plus-function, it should be construed as follows:<br><br>**Function:** realizing functions of the communications device<br><br>**Structure:** hardware and/or software that includes a processor that executes program code accessible from a memory, as disclosed in Figures 1–3 and the text of the specification describing those figures | Indefinite, 112 ¶ 6<br><br>**Function:** "for realizing functions of the wireless communications device" ('777 patent)<br>"for realizing functions of the communications device" ('913 patent)<br><br>**Structure:** none disclosed (Indefinite) |

The phrase "control circuit" does not invoke 35 U.S.C. 112, ¶ 6. There is a rebuttable presumption that § 112 ¶ 6 does not apply because "control circuit" does not use the terms "means" or "step for." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Moreover, "the ultimate question is whether the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6." *Media Rights Techs. Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015). The phrase "control circuit" itself connotes sufficient structure to enforce the presumption such that § 112 ¶ 6 does not apply. Moreover, the respective claims themselves recite additional structure for the respective "control circuit" recitations to confirm that these do not invoke means-plus-function treatment.

As a starting point, the Federal Circuit has held that the recitation of "circuit" connotes sufficient structure to avoid interpretation of 35 U.S.C. 112, ¶ 6. *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004); *Mass. Inst. of Tech. and Elec. For Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1355 (Fed. Cir. 2006) ("[T]he term 'circuit,' combined with a description of the function of the circuit, connoted sufficient structure to one of ordinary skill in the art of avoid 112 ¶ 6 treatment."). "[D]istrict courts considering a 'circuit' or 'circuitry' term have overwhelmingly concluded that it is not a means-plus-function limitation." *Intellicheck*

*Mobilisa, Inc. v. Honeywell Intl. Inc.*, C16-0341JLR, 2017 WL 6550700 at *4 (W.D. Wash. Dec. 21, 2017); *see also Core Wireless Licensing S.A.R.L. v. L.G. Elecs. Inc.*, No. 2:14-cv-0911, 2015 WL 6956722, *17 (E.D. Tex. Nov. 9, 2015) (finding that the term "circuitry" connoted sufficient structure to one skilled in the art and unpersuaded by attorney argument to "ignore the repeated holdings that 'circuitry' is structure."). Google fails to distinguish these cases.

Indeed, the phrase "control circuit" alone connotes sufficient circuitry structure. Dr. Hernandez explains that at the time of the inventions of the '777 and '913 patents, control circuity for wireless devices such as phones was well known in the art, and one skilled in the art knew what control circuitry would achieve the functionality of a wireless device. (Hernandez Decl. at ¶¶ 94–95.) Moreover, dictionary definitions at the time of the '777 and '913 inventions further prove that "control circuit" connotes structure to those skilled in the art: "[COMPUTSCI] One of the circuits that responds to the instructions in the program for a digital computer. [ELEC] A circuit that controls some function of a machine, device, or piece of equipment." (Ex. 10, MCGRAW-HILL DICT. OF SCIENTIFIC AND TECH. TERMS (1994)); *see also Apex Inc. v. Raritan Comp., Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003) ("The term 'circuit' is defined as 'the combination of a number of electrical devices and conductors that, when interconnected to form a conducting path, fulfill some desired function.' *Dictionary of Computing*, 75 (4th ed.1996). In light of this definition, it is clear that the term 'circuit,' by itself connotes some structure.").

Not only does "circuit" itself connote sufficient structure, but the respective claims each further define structure for the recited "control circuit" recitations. First, claim 3 of the '913 patent further defines the "control circuit" structure by stating that "a processor [is] installed in the control circuit for executing a program code" and that "a memory [is] coupled to the processor for storing the program." Similarly, claim 2 of the '777 patent defines structure for the "control circuit" by requiring "a central processing unit for executing a program code to operate the control circuit; and a memory for storing the program code." The case law makes clear that a claim limitation including the word "means" is not subject to means-plus-function treatment where the claim itself otherwise defines that limitation's structure. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420,

1427–28 (Fed. Cir. 1997) (even if a claim uses the term "means," "where a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format."). Here, the claims omit "means" such that there is presumption against means-plus-function treatment, and the claims themselves recite ample structure for the control circuit. In this situation, there is no basis to construe "control circuit" as a means-plus-function limitation.

As discussed by Dr. Hernandez, the circuitry or chipsets used to control wireless devices were well known at the time of the inventions. (Hernandez Decl. at ¶¶ 94–95.) And, in the context of the claims at issue, which are directed at reestablishing the receiver of an RLC entity, it was well known that the wireless chipsets used in the devices performed the reestablishing function. (*Id.*)

Tellingly, the cases Google cites do not address the terms "circuit" or "control circuit." In *Media Rights Techs., Inc. v. Capital One Fin. Corp*., the court construed "compliance mechanism," noting that "the claims do not use the term 'compliance mechanism' as a substitute for an electrical circuit, or anything else that might connote a definite structure." 800 F.3d at 1372. Similarly, *Williamson* construed not "circuit," but "module," which the Federal Circuit considered a nonce word. 792 F.3d at 1349–50. L2MT is not aware a single instance where the Federal Circuit considered the term "circuit" to be a nonce word. Accordingly, the Court should hold that "control circuit" in the '777 and '913 patents does not invoke a means- plus-function construction.

Should the Court disagree, the respective specifications disclose adequate structure to prevent the claims from being indefinite. First, Figure 1 of both patents illustrates the respective control circuits as including a CPU, memory, and program code. (Ex. 3 at FIG. 1; Ex. 4 at FIG. 1.) Second, Figure 2 of both patents disclose a diagram of the claimed program code used to operate the control circuit, complete with annotations showing the relevant interactions between the different architectural layers of the 3G standard, which are function of the wireless communication device. (Ex. 3 at FIG. 2; Ex. 4 at FIG. 2.) Figure 3 of both patents disclose flowcharts of the algorithm relevant to the functions recited in the claims, which is embodied in the program code.

(Ex. 3 at FIG. 3; Ex. 4 at FIG. 3.) The corresponding specifications also disclose that the control circuit executes the program code in memory through the central processing unit. (Ex. 3 at 3:7–26; Ex. 4 at 4:43–62.) Google's argument simply ignores the disclosures of the patents providing sufficient structure for the respective control circuit recitations and should be rejected.

**J.      "reset procedure" ['913 patent, Claims 1 and 3]**

| L2MT's Construction | Google's Construction |
|---|---|
| No construction is necessary; the proposed phrase is only in the preamble and thus nonlimiting.<br><br>In the alternative, if the Court decides that the phrase requires construction, then: "a procedure that includes resetting certain state variables to their original values and resetting configurable parameters" | "a procedure triggered to recover a protocol error in which all state variables, timers and configured values are set to their original states or original configured values, which is different from a reestablishment procedure" |

Google proposed construing this phrase, but the Court should not do so. The term "reset procedure" appears in only the preambles of claims 1 and 3 of the '913 patent:

> Claim 1: A method of handling a variable of a Radio Link Control *reset procedure* during receiver-side-only re-establishment in a wireless communications system

> Claim 3: A communications device utilized in a wireless communications system for accurately handling a variable of a Radio Link Control *reset procedure* during receiver-side-only reestablishment

Google points to the preambles to assert that claims 1 and 3 are "directed to" a reset procedure. (Dkt. 35 at 29–30.) But Google is mistaken. Neither preamble describes performing a reset procedure. Rather, they indicate that claims 1 and 3 are directed to ***handling a variable of a Radio Link Control reset procedure <u>during reestablishing the receiver side of an RLC entity</u>***. Google also points to the '913 patent's title, which of course is not part of the claims. The title also indicates that the invention is directed to managing a variable of a reset procedure "during receiver-side-only re-establishment."

None of the limitations of the body of these claims recite performing a reset procedure.

Thus, the claims are not directed to a reset procedure itself, but instead to what happens during receiver-side-only reestablishment. As such, Google's arguments are misplaced and "reset procedure" does not need construction.

The specification of the '913 patent describes the invention's context as managing the reset state variable during the reestablishment procedure. (Ex. 3 at 4:1–20.) In addition to the overlap in function between reestablishment and reset discussed above, there may be an ongoing reset procedure running concurrently with a reestablishment procedure. (*Id.* at 2:12–23.) In the ongoing reset procedure, the RLC entity maintains the reset state variable VT(RST) as a counter that is incremented during the ongoing reset procedure. (*Id.* at 2:7–13.) Once VT(RST) reaches a maximum value, the RLC entity terminates the ongoing reset procedure and reports an unrecoverable error, triggering another reestablishment procedure. (*Id.* at 2:13–16.)

In the prior art, when only the receiver side of the RLC entity is being reestablished and when there is an ongoing RLC reset procedure, the RLC entity will abort the ongoing reset procedure and restart a new reset procedure after the reestablishment terminates. (*Id.* at 2:24–26.) However, the prior art standard does not disclose resetting the reset state variable VT(RST). Therefore, even after the receiver side of the RLC entity has been reestablished, the reset state variable VT(RST) may remain high and near its maximum value. As the new reset procedure continues, the incrementing VT(RST) may reach its maximum value and report an unrecoverable error. (*Id.* at 2:26–35.) Such an error requires that the RLC entity be reestablished again unnecessarily. (*Id.* at 2:35–36.)

The '913 patent solves this problem by providing that the reset state variable VT(RST) is reset as part of the reestablishing procedure. This prevents the reset state variable VT(RST) from prematurely reaching its maximum value and avoids unnecessarily reporting an unrecoverable

error and triggering another reestablishment of the receiver side of the RLC entity. (*Id*. at 4:7–23.) Importantly, this context conclusively shows that the invention pertains to resetting a state variable during a receiver side reestablishment procedure to reduce the risk of an unrecoverable error that would cause reestablishment to be repeated. The actual claim steps are directed to this resetting of the state variable during a reestablishing procedure.

Because the '913 patent claims are not directed to and do not require performing a reset procedure, it is unnecessary and would be confusing to the jury to construe "reset procedure." Google puts the high risk of confusion on full display when accusing L2MT of erroneously attempting to prove infringement of the '913 patent by referring to the portion of the 3G standard that relates to reestablishment. But, again, the claims are directed to reestablishing the receiver side of an RLC entity, not to resetting the RLC entity. Unsurprisingly, the portion of the 3G standard that relates to managing the reset state variable recited in the claims during a reestablishment procedure is the portion of the standard that deals with the reestablishment procedure. (Ex. 11, Section 9.7.7.)

To the extent the Court is inclined to construe this language, L2MT's proposed construction is the only correct construction. L2MT's construction provides a general description of what a reset procedure includes consistent with the understanding of a POSITA at the time of the invention. Google's construction is wrong for two reasons. First, it is based on a statement made during prosecution of the '777 patent, which does not claim common priority with the '913 patent. Without that connection, the applicant's statements in the '777 patent have no bearing on the scope of the claims of the '913 patent. *See Abbott Labs. v. Dey L.P.*, 287 F.3d 1097, 1104–05 (Fed. Cir. 2002) (arguments made during prosecution of an unrelated, but commonly-owned patent with a common inventor and similar subject matter did not create prosecution history estoppel).

Second, Google's proposed construction suffers from the fatal flaw that it requires that "all" state variables, timers, and configured values be set to their original states or original configured values. As set forth by Dr. Hernandez, a person skilled in the art reading the patent and with knowledge of the 3G specification would understand that not all state variables and timers are reset to their original values, and configured values are not reset to their originally configured values. (Hernandez Decl. at ¶ 116.) In particular, the version of the 3G standard that existed before the invention date of the '913 patent, which is strong evidence of a POSITA's understanding, plainly states that not all timers are reset to their initial values, not all timers are stopped, and configured values are not reset to their originally configured values:

> 11.4.3 Reception of the RESET PDU by the Receiver
> . . .
> - reset the state variables described in subclause 9.4 except VT(RST) to their initial values;
> - stop all the timers described in subclause 9.5 except Timer_RST, Timer_Discard, Timer_Poll_Periodic and Timer_Status_Periodic;
> - reset configurable parameters to their configured values;

(*Id.* (citing to Ex. 11, Section 11.4.3).)

The additional aspect of Google's proposed construction indicating that a reset procedure "is different from a reestablishment procedure" is unnecessary and would only further confuse the jury. This construction could lead the jury to incorrectly believe that reset and reestablishment are entirely different, which they are not. As discussed above, the two procedures share some similarities. Moreover, the negative limitation may lead the jury to believe that there cannot be concurrently running reestablishment and reset procedures, which is also incorrect.

For the foregoing reasons, "reset procedure" should not be construed as doing so would confuse the jury into believing that the '913 claims require performing a reset procedure. If the Court does construe the phrase, the Court should adopt L2MT's construction.

28

## VI.    CONCLUSION

L2MT respectfully requests that the Court adopt the claim construction positions provided by L2MT herein, as well as reject Google's proposed constructions. The Court should also reject Google's indefiniteness arguments.


Dated: November 30, 2021                    By: */s/ Joseph F. Marinelli*
                                            Timothy P. Maloney (IL 6216483)
                                            Joseph F. Marinelli (IL 6270210)
                                            Evan J. Kline-Wedeen (IL 6329941)
                                            **FITCH, EVEN, TABIN & FLANNERY LLP**
                                            120 S. LaSalle St., Suite 2100
                                            Chicago, IL 60603
                                            Telephone: 312.577.7000
                                            tim@fitcheven.com
                                            jmarinelli@fitcheven.com
                                            eklinewedeen@fitcheven.com

                                            *Attorneys for Plaintiff*
                                            *L2 Mobile Technologies LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was electronically filed on November 30, 2021 using the Court's CM/ECF system, which will send notice of such filing to all counsel of record who are deemed to have consented to electronic service.

*/s/ Joseph F. Marinelli*
Joseph F. Marinelli
